[No. A086152. First Dist., Div. Two. Oct. 10, 2000.]

NORCAL MUTUAL INSURANCE COMPANY, Plaintiff and Appellant,
v.
NANCY NEWTON, Defendant and Respondent.

**COUNSEL**

Sinnott, Dito, Moura & Puebla, Blaise S. Curet and Stephen R. Wong for Plaintiff and Appellant.

A. Charles Dell'Ario and Steven B. Piser for Defendant and Respondent.

**OPINION**

**KLINE, P. J.**—NORCAL Mutual Insurance Company (NORCAL) appeals from the trial court's denial of its petition to compel arbitration of a dispute with respondent Nancy Newton. NORCAL maintains the petition should have been granted because respondent was required to arbitrate by the language of the medical malpractice insurance policy it issued to respondent's late husband, by respondent's acceptance of the benefits of the policy, and by respondent's initiation of arbitration against NORCAL. We conclude the trial court's order must be reversed.

### STATEMENT OF THE CASE AND FACTS

Dr. Harvey Newton, a psychiatrist, was covered under a medical malpractice insurance policy extended by appellant NORCAL. He and respondent, his wife, were sued in a malpractice action by a husband and wife who had each been in individual therapy with Dr. Newton and had been in couples therapy with Dr. and Mrs. Newton that included allegations of sexual misconduct by Dr. Newton and unauthorized treatment of patients by respondent. The plaintiffs alleged that Dr. Newton became involved in a sexual relationship with the plaintiff wife, allowed and failed to supervise the treatment of the plaintiffs by respondent, who was not a therapist, and inappropriately treated the plaintiff husband. The plaintiffs alleged that respondent treated the plaintiffs despite not being a therapist, violated her professional relationship by blaming the plaintiff wife for the sexual relationship with Dr. Newton and for breaking up the Newtons' family life and

by inappropriately terminating therapy, and threatened to tell the plaintiff husband about the alleged sexual relationship. According to a letter by Dr. Newton's attorney, Dr. Newton acknowledged that the plaintiff wife had told him she had fallen in love with him and acknowledged having occasional meetings with her outside of the office, but denied any overt sexual activity.[1]

On March 27, 1996, Attorney James Murphy tendered the malpractice complaint to NORCAL for defense and indemnity "[o]n behalf of Dr. Newton and Nancy Newton." Murphy's letter stated that if NORCAL decided to provide a defense under a reservation of rights, Dr. Newton requested that Murphy's firm be appointed pursuant to Civil Code section 2860.[2] On April 23, 1996, NORCAL agreed to defend Dr. Newton. According to the allegations of NORCAL's subsequent petition to compel arbitration and the declaration of NORCAL's counsel, NORCAL "agreed to defend DR NEWTON and MRS. NEWTON on an interim basis, subject to further investigation and a reservation of rights, including the right to decline to pay or indemnify any settlement and to seek reimbursement of all fees and costs associated with the defense of the [plaintiffs'] action."[3]

On October 14, 1996, NORCAL's counsel, Blaise S. Curet, wrote respondent a 23-page letter, informing her that NORCAL agreed to provide her with a defense in the malpractice action pursuant to a reservation of rights and setting forth NORCAL's understanding of the claims against the Newtons and relevant portions of the insurance policy. Among other things, NORCAL explained that the insurance policy extended coverage for "an occurrence involving direct patient treatment" by Dr. Newton and by "health care extenders" for whom Dr. Newton was legally responsible, provided the extender had been approved by NORCAL and an endorsement had been

---

[1]Respondent accuses NORCAL of violating a confidentiality agreement to which the settlement of the malpractice case was subject by including details of the case in its opening brief. She does not provide any citation to the confidentiality agreement and the record does not disclose the outcome of respondent's attorney's application for an in camera hearing. The nature of the plaintiffs' allegations, however, are relevant to the issues on appeal as they bear on respondent's relationship to the insurance policy for purposes of this case.

[2]Civil Code section 2860 requires insurers to provide independent counsel for the insured in certain situations of conflict of interest between the insurer and insured.

[3]No reservation of rights letter from NORCAL appears in the record. Respondent takes issue with NORCAL's citation of its counsel's declaration filed in San Mateo County, where the petition to compel arbitration was initially filed. As NORCAL recognizes, however, the declaration filed with the October 30, 1998, petition in San Francisco, from which this appeal arises, contains the same statements. While citation to the latter document would have been preferable, we do not share respondent's view that this matter warrants imposition of sanctions under rule 18 of the California Rules of Court. As for respondent's complaint about NORCAL's citation of other documents filed in San Mateo Superior Court in connection with earlier proceedings in this matter, we note that the case was transferred to San Francisco and documents filed in all stages of the case are part of its record.

issued extending coverage for the claim. NORCAL stated that respondent had *not* been endorsed as a health care extender under Dr. Newton's insurance policy and that Dr. Newton's application for insurance did not identify respondent as having any role in his practice. The letter stated: "The NORCAL policy does not extend coverage to you. However, NORCAL will provide you with a defense under Dr. Newton's policy based upon a reservation of rights. Please be advised that NORCAL will provide a defense only to you, and will not indemnify you for any of the claims asserted by the [plaintiffs]." NORCAL further stated that "only a single limit of liability is available for the claims asserted by the [plaintiffs] against you and Dr. Newton" and that the "limits of liability will potentially apply only for indemnity for Dr. Newton, and not you." NORCAL stated that it would defend a claim containing allegations of sexual misconduct or sexual activity, but would not pay damages for such a claim on behalf of Dr. or Mrs. Newton, and that on a claim describing sexual misconduct or sexual activity as well as another theory of liability, NORCAL would pay damages "only for the portion of the claim completely unrelated to sexual misconduct or sexual activity and only on behalf of Dr. Newton, not you." NORCAL further indicated there might be grounds for rescission of the insurance policy based on Dr. Newton's failure to report on his application that he practiced with nonphysician health care providers.

On October 18, 1996, on behalf of Dr. and Mrs. Newton, Murphy reiterated a previously stated demand that NORCAL settle the malpractice action for the policy limits ($1 million).[4] On November 13, NORCAL informed Murphy that both the insurance policy and the Business and Professions Code required Dr. Newton's written consent to settle. NORCAL provided an authorization which stated that Dr. Newton authorized the settlement and understood all settlements had to be reported by NORCAL to the National Practitioner Data Bank (data bank) and were also reported to the Medical Board of California. NORCAL's counsel's cover letter stated that NORCAL continued to reserve all its rights under the policy and California law. Dr. Newton signed the authorization on November 20, 1996, the date of the mediation hearing. NORCAL did not seek respondent's authorization to settle. Murphy's November 18, 1996, mediation brief in the malpractice action was presented on behalf of Dr. and Mrs. Newton and included separate sections discussing the nonliability of each defendant. Respondent was among the parties and attorneys who signed the November 20, 1996, mutual release and covenant not to sue in the malpractice action.

---

[4]According to the declaration of NORCAL's counsel, Blaise S. Curet, and the allegations of the petition to compel arbitration, Murphy had previously demanded the settlement "as counsel for Dr. Newton and Mrs. Newton" on September 27, 1996. The September 27 letter, however, does not appear in the record.

After settlement of the malpractice action, a dispute arose between NORCAL and the Newtons concerning the language by which NORCAL would report the settlement to the data bank. According to a letter from Murphy to NORCAL, Dr. Newton's consent to the settlement had been predicated upon NORCAL's assurance that he would be allowed to approve this language; NORCAL was insisting on language indicating the case had been settled for sexual misconduct despite Dr. Newton's objection; and the report to the data bank should not include the unproven allegations of sexual misconduct. This January 15, 1997, letter indicated that NORCAL had refused to "recognize that the settlement payment covered both Harvey Newton and Nancy Newton."

On April 4, 1997, Murphy wrote to NORCAL demanding arbitration under the insurance policy. This letter detailed a number of issues arising from the dispute over language for the report to the data bank: breach of oral contract, misrepresentation, intentional infliction of emotional distress (claiming mental anguish and physical symptoms on behalf of both Dr. and Mrs. Newton), bad faith (based on NORCAL's cancellation of Dr. Newton's malpractice policy), breach of fiduciary duty and intentional interference with prospective economic advantage. Murphy stated, "[t]his letter is notice of the nature of the claims which policy holder Harvey Newton and additional insured Nancy Newton are making." The letter indicated that Dr. Newton had selected Basil Plastiras as arbitrator and was signed by Murphy as "Attorney for Dr. Newton."

On April 23, 1997, Murphy repeated his demand for arbitration, referring to it as having been "submitted on behalf of my clients, Dr. and Mrs. Harvey Newton" and again signing the letter as "Attorney for Dr. Newton."

NORCAL responded by selecting its arbitrator, David Meadows, and making claims against Dr. and Mrs. Newton for declaratory relief (seeking determinations that the malpractice insurance policy did not cover Nancy Newton and that the malpractice plaintiffs' damages came within the insurance policy's exclusion for sexual misconduct or sexual activity related to direct patient treatment); money had and received; reimbursement; and rescission (based on Dr. Newton's alleged failure to inform NORCAL that respondent provided treatment in his practice).

Murphy sought a preliminary injunction to prevent NORCAL from submitting its report to the data bank, which was denied on July 8, 1997. The trial court took the view that NORCAL's language complied with the requirements of the federal statute mandating reporting of the settlement.

On July 16, 1997, Attorney Steven B. Piser informed NORCAL that he would be representing Dr. and Mrs. Newton in the arbitration. By letter of

September 5, 1997, Piser, on behalf of Dr. and Mrs. Newton, requested that NORCAL dismiss its claims and submit to arbitration through Judicial Arbitration and Mediation Services (JAMS) rather than through the American Arbitration Association. On September 12, Piser expressed Dr. Newton's interest in an expedited determination of whether the language in NORCAL's report to the data bank "was consistent with its obligations" and suggested JAMS arbitration of that single issue.

By letter of October 15, 1997, Piser informed NORCAL, on behalf of Dr. and Mrs. Newton, that the April 4, 1997, request for arbitration was withdrawn without prejudice.

On November 13, 1997, Piser informed NORCAL that Dr. Newton had died over the weekend of October 18. Piser stated that his office had filed a petition to compel arbitration by JAMS of the issue concerning NORCAL's report to the data bank, but had not served the petition due to the need to substitute Dr. Newton's personal representative. Piser suggested that the parties release all claims against each other, stating this procedure had been authorized by respondent.

NORCAL, on January 3, 1998, stated its intention to proceed with its demand for arbitration. It indicated that the Newtons' arbitrator had not responded to several proposals from NORCAL's arbitrator for a neutral arbitrator. In response, Piser informed NORCAL that Nancy Newton "does not consent to arbitration of any disputes between herself and NorCal."

On April 14, 1998, NORCAL filed a petition to compel arbitration in San Mateo County Superior Court. Respondent moved to quash service of the petition on April 27. She also filed a motion to change venue to San Francisco County. The motion to quash service was granted on June 2. On July 20, the motion for change of venue was granted and the court ordered the case transferred to San Francisco County.

The petition to compel arbitration was subsequently filed in San Francisco County.[5] At a hearing on October 28, 1998, the judge indicated the view that, because respondent benefited from the insurance policy by having NORCAL fund her defense, she was obligated to arbitrate, as Dr. Newton would have been. The petition was denied without prejudice, however, after the court concluded the wording of the notice did not apprise respondent of all the bases of NORCAL's claim. The petition was again noticed and filed on October 30, 1998. It was then denied after a hearing on December 7,

---

[5]The petition was first noticed and filed on September 15, again on October 14, and, finally, on October 30, 1998.

1998, at which the court indicated NORCAL had not sustained its burden of proving that respondent was a party to the insurance policy or that she had accepted its benefits within the meaning of Civil Code section 1589. The order denying the petition was filed on January 6, 1999.

NORCAL filed a timely notice of appeal on March 2, 1999.

DISCUSSION

I.

As a preliminary matter, the parties dispute the appropriate standard of review for this case. According to NORCAL, there are no factual disputes and we, accordingly, should review the denial of the petition to compel arbitration de novo. (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1670 [53 Cal.Rptr.2d 515]; *Bos Material Handling, Inc. v. Crown Controls Corp.* (1982) 137 Cal.App.3d 99, 105 [186 Cal.Rptr. 740]; *Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1003 [119 Cal.Rptr. 130].) ▬ "Whether an arbitration agreement applies to a controversy is a question of law to which the appellate court applies its independent judgment where no conflicting extrinsic evidence in aid of interpretation was introduced in the trial court." (*Brookwood, supra,* 45 Cal.App.4th at p. 1670.)

Respondent, however, argues that the trial court's ruling depended upon the factual questions whether she received any benefits under the policy and whether her counsel were authorized to submit any matter to arbitration. Where the trial court's decision on arbitrability is based upon resolution of disputed facts, we review the decision for substantial evidence. (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 [35 Cal.Rptr.2d 800].) In such a case we must " 'accept the trial court's resolution of disputed facts when supported by substantial evidence; we must presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of the credibility of witnesses and the weight of the evidence.' " (*Ibid.*)

In this case, the issues which respondent presents as factual questions are actually legal ones. The parties do not dispute that NORCAL provided respondent with a defense to the malpractice suit under a reservation of rights. Nor do they dispute that no other benefit was offered to respondent under the insurance policy. The critical question—whether the representation provided by NORCAL constituted a benefit under the policy sufficient to require respondent's acceptance of the policy's obligations—is a question

of law. Similarly, on the question of respondent's attorneys' authorization to submit to arbitration, the parties do not dispute what actions or inaction may be attributed to respondent but the legal significance of her action or inaction. Accordingly, we review the trial court's decision de novo. (See *Berman v. Dean Witter & Co., Inc., supra,* 44 Cal.App.3d at p. 1003.)

## II.

▇▇ NORCAL contends the language of the insurance policy requires respondent to arbitrate its claims. As described in the petition to compel arbitration and declaration of NORCAL's counsel, the policy provides that "[a]ny dispute arising out of this policy will be submitted to and settled by arbitration in San Francisco, California or any other mutually agreed upon location."[6] NORCAL argues that this broad language demonstrates an intent to arbitrate all claims arising from the subject matter of the contract, regardless of whether they are asserted by a contracting party. NORCAL further maintains that respondent was bound by the arbitration provision of the insurance policy because she sought and accepted the benefits of that policy. Under Civil Code section 1589, "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." Finally, NORCAL urges that respondent is bound to arbitrate by her initial request for arbitration.

A number of California cases have considered the question whether arbitration agreements may be enforced against parties who did not expressly agree to their terms. Many of these cases involve claims related to medical malpractice asserted by relatives of a patient who signed an arbitration agreement with the health care provider, and most of them hold the nonsignatories bound by the arbitration agreement. (*Mormile v. Sinclair* (1994) 21 Cal.App.4th 1508 [26 Cal.Rptr.2d 725]; *Michaelis v. Schori* (1993) 20 Cal.App.4th 133 [24 Cal.Rptr.2d 380]; *Bolanos v. Khalatian* (1991) 231

---

[6]Only portions of the policy itself are part of the record on appeal, and these do not include the language of the arbitration provision. The language quoted in the text is taken from the declaration of NORCAL's counsel, which is, of course, hearsay. NORCAL has requested that we take judicial notice of the entire insurance policy (Evid. Code, § 452, subd. (h)) or admit the policy into evidence under Code of Civil Procedure section 909. While NORCAL characterizes the policy as "not subject to dispute," respondent points out that it is unauthenticated and that NORCAL's only explanation for why it was not offered in the trial court is that "[i]t was not until after Respondents questioned the applicability of the arbitration agreement that the entire Policy became.relevant. NORCAL did not have a reasonable opportunity to introduce the entire Policy after Respondents contested the petition." We deny the request for judicial notice of this document, which could have been, but was not, presented to the trial court. We note that while respondent opposed the request for judicial notice, she does not contest the wording of the policy as described in the text.

Cal.App.3d 1586 [283 Cal.Rptr. 209]; *Gross v. Recabaren* (1988) 206 Cal.App.3d 771 [253 Cal.Rptr. 820].) The agreements in these cases called for arbitration of " 'any dispute as to medical malpractice' " (*Michaelis, supra,* 20 Cal.App.4th at p. 139; *Gross, supra,* 206 Cal.App.3d at p. 774) or similar language (*Mormile, supra,* 21 Cal.App.4th at p. 1510 [" 'All Claims Must Be Arbitrated' "]; *Bolanos, supra,* 231 Cal.App.3d at p. 1591 [same]); several included language expressly stating the contracting parties' intention to bind all parties with claims arising out of or relating to the treatment of the patient, including spouses, children and heirs of the patient. (*Mormile, supra,* 21 Cal.App.4th at p. 1510; *Michaelis, supra,* 20 Cal.App.4th at p. 139; *Bolanos, supra,* 231 Cal.App.3d at p. 1591.) As stated in *Bolanos, supra,* 231 Cal.App.3d at page 1591, the latter language "makes it clear that the agreement was intended to bind *all* parties whose claims arise out of or relate[ ] to the treatment provided to [the patient]." (Original italics.) " ' "[W]here, as here, a patient expressly contracts to submit to arbitration 'any dispute as to medical malpractice,' and that agreement fully complies with [Code Civ. Proc. § ] 1295, it must be deemed to apply to *all* medical malpractice claims arising out of the services contracted for, regardless of whether they are asserted by the patient or a third party." ' " (*Michaelis, supra,* 20 Cal.App.4th at p. 139, quoting *Bolanos, supra,* 231 Cal.App.3d at p. 1591, italics added.)[7]

The language of the insurance policy at issue in the present case is similarly broad, providing for arbitration of "any dispute arising out of this policy." The context of the present case, however, is different from those described above, as it involves a contract for professional liability insurance rather than for provision of medical services. In the cases above, policy considerations compelled holding the nonsignatory relatives bound by the agreement between the patient and health care provider. Thus, *Gross v. Recabaren, supra,* 206 Cal.App.3d 771, which involved a loss of consortium claim by the patient's wife, explained that it found the wife bound by the

[7]Code of Civil Procedure section 1295 imposes various requirements upon contracts for medical services which contain provisions for arbitration of disputes as to professional negligence of a health care provider. Among other things, such contracts must make the arbitration provision the first article of the contract and must employ the following language: " 'It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.' " (Code Civ. Proc., § 1295, subd. (a).) A contract which complies with subdivisions (a), (b), and (c) of section 1295 "is not a contract of adhesion, nor unconscionable nor otherwise improper." (Code Civ. Proc., § 1295, subd. (e).)

arbitration agreement because this conclusion was necessary to "safeguard the physician-patient relationship" and "preserve important privacy rights of the patient." *Gross* noted that a contrary conclusion would require a physician seeking to ensure the viability of an arbitration agreement to question the patient at each visit as to changes in marital status and potentially delay treatment in order to obtain the signature of a new spouse, as well as impermissibly require spouses to share medical decisions with each other and possibly have veto power over each other's decisions. (*Id.* at pp. 781-782.) *Mormile v. Sinclair, supra,* 21 Cal.App.4th at page 1514, agreed with *Gross*'s focus "on the sanctity of the physician-patient relationship—a safe haven which would be severely threatened if the physician were obliged to obtain the signature of the patient's spouse to the arbitration agreement." Recognizing that "[t]wo competing rights are at stake: the patient's right of privacy and the spouse's right to jury trial of a treatment-related claim," *Mormile* held the former outweighed the latter. (*Ibid.*; see also *Herbert v. Superior Court* (1985) 169 Cal.App.3d 718, 725 [215 Cal.Rptr. 477] [wrongful death claims of nonsignatory heirs must be arbitrated where health plan member agreed to arbitration of his and heirs' claims; court noted, among other things, that heirs are not identified until the time of death and, if they refused to sign, should not be able to potentially delay medical treatment to party in need].)[8] These issues of privacy and access to medical treatment are not involved in the present case.[9]

---

[8]*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 789-790 [79 Cal.Rptr.2d 273], described *Mormile v. Sinclair, supra,* 21 Cal.App.4th 1508, *Michaelis v. Schori, supra,* 20 Cal.App.4th 133 and *Bolanos v. Khalatian, supra,* 231 Cal.App.3d 1586, as cases in which the arbitration agreements complied with Code of Civil Procedure section 1295 and "the conclusion that a nonsigning third party was bound by the arbitration agreement rested in part on consideration of the public policies that led to enactment of that legislation [citation], and in part on the existence of an agency or quasi-agency relationship between the patient who had signed the agreement and the nonsigning third party—in *Mormile* and *Michaelis,* the patient's spouse, and in *Bolanos,* the father of the patient's baby." *Badie* itself did not involve a nonsignatory to an arbitration agreement but rather an arbitration provision unilaterally imposed by a bank upon its credit card holders. *Badie* discussed the nonsignatory cases in rejecting the trial court's implicit determination that these cases had eroded the need for consent to alternative dispute resolution procedures and reiterated that California's public policy favoring alternative dispute resolution does not come into play unless parties have entered an enforceable arbitration agreement. (*Badie, supra,* 67 Cal.App.4th at pp. 787-790.)

[9]Two cases in this area, both from the Second District, reach a result contrary to those above. *Rhodes v. California Hospital Medical Center* (1978) 76 Cal.App.3d 606 [143 Cal.Rptr. 59] held a husband and son were not required to arbitrate a wrongful death action where the patient had signed an arbitration agreement and the husband had also signed such an agreement, acting as her agent. According to *Rhodes,* the policy in favor of arbitration as a means of dispute resolution "does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement" and "the decedent's agreement to arbitrate *her* possible cause of action" could not "bar the constitutional and procedural rights of the decedent's heirs in their own, independent

Cases holding nonsignatories bound by arbitration contracts are not limited to those involving relatives of patients who have agreed to arbitration. *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699 [131 Cal.Rptr. 882, 552 P.2d 1178] involved malpractice claims asserted by a state employee against health care providers who treated her under a health services plan in which she was enrolled through her employment. The contract entered between the employer (through the board of the state employees retirement system) and the health services plan called for binding arbitration of malpractice claims. *Madden* concluded that because the board had the statutory authority to negotiate group medical contracts on behalf of state employees, arbitration had become an accepted means of dispute settlement and a general agent is authorized to " 'do everything necessary or proper and usual . . . for effecting the purpose of his agency,' " the board had the authority to agree to a contract including an arbitration provision that would bind employees. (*Id.* at p. 706.) Accordingly, the employee was bound to arbitrate her malpractice claims despite not having signed the arbitration agreement.

In *Harris v. Superior Court* (1986) 188 Cal.App.3d 475 [233 Cal.Rptr. 186], a mother and daughter filed a malpractice suit against a doctor, a hospital and the holding company of the prepaid health services plan through which the plaintiffs were covered as a benefit of the father's employment. The father had signed an application by which he agreed to binding arbitration of disputes with the health plan, the professional corporation through which the doctor practiced (Hawthorne Community Medical Group, Inc.), and their " 'employees or other contracting health professionals.' " (*Id.* at p. 477.) When the plaintiffs tried to compel the doctor to arbitrate, the doctor argued he was not bound by the arbitration agreement because he was not a party to it. *Harris* noted that because the agreement the father signed specifically named Hawthorne and its contracting health professionals, the

---

action." (*Id.* at pp. 609-610, original italics.) In *Baker v. Birnbaum* (1988) 202 Cal.App.3d 288 [248 Cal.Rptr. 336], the patient signed an agreement to arbitrate " 'any dispute as to medical malpractice . . .' " which "purported to bind [the patient] and 'anyone else who may have a right to assert a claim on [her] behalf . . .' as well as other persons for whom she had responsibility, such as her spouse and any children." (*Id.* at p. 290.) This agreement was held inapplicable to the patient's husband's claim for loss of consortium because the patient had "contracted for medical care solely on her own behalf, and the agreement to arbitrate related only to such services as would be provided to her under that contract." (*Id.* at p. 292.) *Rhodes* and *Baker* have been described as reflecting "a minority view as to the rights of a nonsignatory to an arbitration agreement to pursue an action in the courts as distinguished from arbitration." (*Keller Construction Co. v. Kashani* (1990) 220 Cal.App.3d 222, 226, fn. 3 [269 Cal.Rptr. 259].) *Gross v. Recabaren, supra,* 206 Cal.App.3d at page 780, chose to follow the reasoning of *Herbert v. Superior Court, supra,* 169 Cal.App.3d 718 rather than that of *Baker* and *Rhodes,* and *Mormile v. Sinclair, supra,* 21 Cal.App.4th at page 1514, described *Baker* as having "generally been ignored or questioned, . . . , with its overly restrictive reading of the scope of arbitration agreements."

doctor would clearly have had a right to *enforce* the arbitration agreement. (*Id.* at p. 478.) *Harris* held the doctor was bound by the arbitration agreement because he was an employee of Hawthorne and treated patients on its behalf, thereby assuming Hawthorne's obligations; because the doctor was a third party beneficiary of the contractual provision requiring arbitration of disputes with Hawthorne's "employees or other contracting health professionals" and could have no greater rights than the contracting parties; and because the doctor's voluntary acceptance of the benefit of the contract, by obtaining patients through the health plan, required him to accept the arbitration provision. (*Id.* at pp. 478-479.)

*Michaelis v. Schori, supra,* 20 Cal.App.4th at page 139, also dealt with an employee bound by the employer's agreement to arbitrate. In that case, a binding arbitration agreement was signed by a pregnant 17 year old and the physician from whom she sought medical care. After the baby was stillborn, the woman and the baby's father sued Dr. Schori and another physician, Dr. Bader. The arbitration agreement was held to apply to Dr. Bader, although she had not signed it, because she was Dr. Schori's employee or associate and the agreement provided for arbitration of claims against " 'the physician, and the physician's partners, associates, association, corporation or partnership, and the employees, agents and estates of any of them . . . .' " (*Ibid.*)

Completely outside the context of medical treatment, *Keller Construction Co. v. Kashani, supra,* 220 Cal.App.3d 222, 228, held that the general partner of a limited partnership, as agent of the partnership and beneficiary of its contracts, was bound by an arbitration agreement entered by the partnership.

The common thread of all the above cases is the existence of an agency or similar relationship between the nonsignatory and one of the parties to the arbitration agreement. In the absence of such a relationship, courts have refused to hold nonsignatories to arbitration agreements. Thus, in *County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237 [54 Cal.Rptr.2d 628], a different division of this court held that an arbitration agreement between a patient and a health care provider did not apply to a cross-complainant who was not a party to the agreement and was seeking indemnity from the health care provider. The patient in *Kaiser* was injured when hit by a car while crossing a street to reach a bus stop. She sued the health care provider who subsequently treated her, the driver of the car responsible for the accident, the county and the transit authority. The driver, county and transit authority sought indemnity from the health care provider. *Kaiser* stated that "[t]he California cases binding nonsignatories to arbitrate their claims fall into two categories. In some cases, a nonsignatory was required to arbitrate a claim because a benefit was conferred on the

nonsignatory as a result of the contract, making the nonsignatory a third party beneficiary of the arbitration agreement. In other cases, the nonsignatory was bound to arbitrate the dispute because a preexisting relationship existed between the nonsignatory and one of the parties to the arbitration agreement, making it equitable to compel the nonsignatory to also be bound to arbitrate his or her claim." (*Id.* at p. 242.) In *Kaiser*, however, there was "no preexisting relationship between the cross-complainants and either [the patient] or [the health care provider] that could support any implied authority for either [the patient] or [the health care provider] to bind any of the cross-complainants by their arbitration agreement." (*Id.* at p. 243.)

In the present case, Harvey Newton contracted with NORCAL for professional liability insurance for himself, "health care extenders" for whom he was legally responsible and for whom an endorsement had been issued under the policy, and employees acting within the scope of their employment for Dr. Newton. The complaint that NORCAL settled on behalf of Dr. and Mrs. Newton was filed by a husband and wife who were allegedly treated by both Dr. and Mrs. Newton, individually and as a couple. In tendering the complaint to NORCAL for defense and indemnity, the Newtons, through their counsel, asked NORCAL to provide coverage under the policy to respondent as well as to Harvey Newton. Indeed, the Newtons' initial demand for arbitration referred to Nancy Newton as an "additional insured" under the policy. Respondent was sued for her role in the plaintiffs' treatment and the only way Dr. Newton's professional liability insurance could apply to her, under the terms of the policy, would be as Dr. Newton's employee or as a "health care extender" working for him. If respondent was in fact a covered employee or health care extender, there would appear to be little question that she would be bound by the arbitration agreement entered by Dr. Newton. (*Harris v. Superior Court, supra,* 188 Cal.App.3d at p. 478; *Michaelis v. Schori, supra,* 20 Cal.App.4th at p. 139.)

NORCAL, of course, expressly informed respondent that she was not covered under Dr. Newton's policy because she had not been endorsed on the policy as a health care extender and because the application for insurance did not identify her as having any role in Dr. Newton's practice. Despite this, NORCAL agreed to provide respondent with a defense under a reservation of rights, making clear it would not indemnify her for any of the plaintiffs' claims.

Respondent stated in her declaration in opposition to the petition to compel arbitration that she had never agreed or consented to binding arbitration with NORCAL, that she never consented to a waiver of her right to a jury trial, that no one ever sought her consent to waive her right to jury trial

or to arbitrate any dispute with NORCAL, that prior to the October 14, 1996, letter, NORCAL had never advised her it agreed to provide her with a defense and that there were no documents other than that letter setting forth the terms and conditions of NORCAL's agreement to provide her with a defense.

Respondent, however, sought the benefits of the insurance policy by tendering defense of the complaint to NORCAL and accepted those benefits by allowing NORCAL to assume the cost of her defense and, together with Dr. Newton, requesting and participating in NORCAL's settlement of the complaint, and requesting arbitration of the ensuing dispute regarding NOR-CAL's report of the settlement to the data bank. Even after Dr. Newton's death and respondent's statement of nonconsent to arbitration, respondent relied upon the terms of the insurance policy to obtain a change of venue.

Respondent claims her attorneys could not bind her to arbitration, relying upon *Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396 [212 Cal.Rptr. 151, 696 P.2d 645, 48 A.L.R.4th 109]. *Blanton* ordered an arbitration agreement and award set aside because the plaintiff's attorney's stipulation to submit to binding arbitration was made without the plaintiff's consent. The court explained that " 'the client as principal is bound by the acts of the attorney-agent within the scope of his actual authority (express or implied) or his apparent or ostensible authority; or by unauthorized acts ratified by the client.' " (*Id.* at p. 403.) In *Blanton*, the attorney conceded that his client had told him she would agree to arbitration only if her right to a de novo trial was preserved. The client did not learn about the stipulation until almost three months after it was entered and immediately objected, fired the attorney and retained new counsel who moved to invalidate the stipulation. On these facts, *Blanton* held the arbitration agreement was invalid because the attorney had no actual authority, submission to arbitration affects the client's "substantial rights" and therefore cannot be supported by apparent authority, and the client did not ratify but rather disaffirmed the agreement. The court did not, however, preclude the possibility of an arbitration agreement entered without the client's express authority being ratified by the client. (*Id.* at pp. 403, 408.)

 A principal is liable "when the principal knows the agent holds himself or herself out as clothed with certain authority and remains silent." (*Jacoves v. United Merchandising Corp.* (1992) 9 Cal.App.4th 88, 103 [11 Cal.Rptr.2d 468]; *Preis v. American Indemnity Co.* (1990) 220 Cal.App.3d 752, 761 [269 Cal.Rptr. 617]; see *Gates v. Bank of America* (1953) 120 Cal.App.2d 571, 576-577 [261 P.2d 545] ["where the rights of third persons depend on his election, the rule is a principal must disaffirm an unauthorized act of his agent within a reasonable time after acquiring knowledge thereof,

else his silence may be deemed ratification or acquiescence in order to protect an unsuspecting third party"].) A principal's failure to promptly disaffirm an agent's conduct on her behalf constitutes a ratification. (*Gaine v. Austin* (1943) 58 Cal.App.2d 250, 259 [136 P.2d 584] [four-month delay before repudiation constituted ratification]; *Hale v. Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 692 [117 Cal.Rptr. 146], disapproved on other grounds in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822, fn. 5 [169 Cal.Rptr. 691, 620 P.2d 141] [" ' ". . . where an agent is authorized to do an act, and he transcends his authority, it is the duty of the principal to repudiate the act as soon as he is fully informed of what has been thus done in his name, . . . else he will be bound by the act as having ratified it by implication." ' "].)

Here, the Newtons' demands for NORCAL to settle the complaint and to submit to arbitration of the data bank report issue were expressly made on behalf of both Dr. and Mrs. Newton. The letters by which these demands were made indicate copies were sent to respondent. Her declaration does *not* state she was unaware of these legal demands being asserted on her behalf, and there is nothing in the record to suggest that she did anything to disavow or disassociate herself from them. It was not until January 1998 that respondent's attorney asserted her nonconsent to arbitration. Unlike the situation in *Blanton*, respondent took no immediate action to express dissatisfaction with Murphy's arbitration demand on her behalf. This failure to promptly disaffirm her agent's assertion of her agreement to arbitrate constituted a ratification. (*Gaine v. Austin, supra*, 58 Cal.App.2d at p. 259.)[10]

---

[10]Respondent argues that NORCAL has improperly raised for the first time on appeal the ostensible authority and ratification issues underlying its contention that respondent's request for arbitration bound her to arbitrate. She complains that the factual predicate to these issues —Murphy's April 4, 1997, letter demanding arbitration—was not presented to the trial court until reply pleadings were filed two court days before the hearing and that she did not have an opportunity to respond to the ostensible authority and ratification issues. While respondent is correct that this letter was submitted to the trial court with NORCAL's reply papers, respondent ignores the fact that both the April 4 and April 23 letters had previously been filed on October 30 as exhibits to NORCAL's counsel's declaration in support of the petition to compel arbitration. Respondent's complaint that she "had no need to assert her failure to receive Mr. Murphy's letters of April 4, 1997 and April 23, 1997, because they were not then before the court" is thus ill-founded. Moreover, the letters had previously been attached as exhibits to a declaration of NORCAL's counsel submitted on October 9, 1998, in support of NORCAL's reply to its first-filed petition in San Francisco, and respondent had objected to the letters as hearsay and irrelevant. Respondent did not object or otherwise refer to these letters in her opposition to the October 30 petition. Respondent's memorandum in opposition to the first San Francisco petition, filed on October 6, 1998, stated: "NorCal claims that a letter written by Nancy Newton's former attorney, James Murphy, to Norcal in connection with the underlying medical malpractice action (to which NorCal was not a party) somehow obligates Nancy Newton to arbitrate" and argued that an attorney has no authority to bind his or her client to arbitration. This document demonstrates that respondent was aware that the

NORCAL asserts that respondent's demands for arbitration in and of themselves constitute an independent basis for compelling her to arbitrate, on the theory that once a party submits a matter to arbitration, she cannot unilaterally withdraw from the process. (*Nghiem v. NEC Electronic, Inc.* (9th Cir. 1994) 25 F.3d 1437, 1440; *Gerard v. Salter* (1956) 146 Cal.App.2d 840, 844 [304 P.2d 237].) *Nghiem* and *Gerard* involved parties who attempted to disavow arbitration after not only agreeing to arbitration but fully participating in proceedings before the arbitrators. In essence, those cases stand for the proposition that a party may not agree to arbitrate a matter, participate in the arbitration and then attempt to avoid its binding nature when the result is unfavorable. In the present case, respondent (with her husband) demanded arbitration of the data bank report issue and took the first step in the process by selecting an arbitrator. After NORCAL had selected its party arbitrator and made its own claims against the Newtons, but before the neutral arbitrator called for by the insurance policy was selected, the Newtons withdrew their request for arbitration. Whether respondent's demands for arbitration, withdrawn before the process of selecting arbitrators was completed, compels her to arbitrate the different issues submitted by NORCAL to arbitration is a very different question from that dealt with in *Nghiem* and *Gerard*.[11]

---

issue of the attorney's ability to bind the client to arbitration was relevant to the petition to compel arbitration. Respondent's counsel argued at the October 28 hearing that an attorney cannot bind a client to arbitrate. Similarly, respondent's November 30, 1998, opposition to the petition eventually heard on December 7 argued that an attorney lacks authority to bind a client to arbitration. At the December 7 hearing, the trial court initially focussed on the fact that letters from Murphy to NORCAL were signed by Murphy as "Attorney for Dr. Newton" rather than as attorney for "Dr. Newton and Mrs. Newton." NORCAL's counsel argued that the letters were expressly written "on behalf of Dr. and Nancy," and stated that "the key fact then is, I think, not only was the benefit of the contract sought by Mrs. Newton, but she, herself, along with Dr. Newton, demanded arbitration. This process has already begun. They even went so far as to select their own party arbitrator." Respondent's counsel then told the court that NORCAL had withdrawn its argument that respondent had agreed to arbitration and conceded that a lawyer does not have the authority to bind a client to arbitration. After respondent's attorney argued the point that a lawyer cannot bind a client to arbitration, NORCAL's attorney stated that the issue was really respondent's "ratification" of the insurance policy by making demands under the contract. Although NORCAL did not directly argue ostensible authority and/or ratification in the trial court, these issues obviously underlie the question of respondent's attorney's authority to bind her to arbitration. Both respondent and the trial court were fully aware of the overarching issue of respondent's attorney's authority.

[11]Respondent claims that NORCAL made a binding judicial admission that she never requested arbitration. She cites NORCAL's counsel's statement at the October 28, 1998, hearing that "[w]e can agree to that right now; that she never asked for arbitration in the past." This statement was made in the course of a discussion about whether NORCAL's notice of the October 28 hearing was sufficient to apprise respondent that one of the grounds upon which NORCAL was seeking to compel arbitration was that respondent had obtained benefits under the insurance policy. The notice stated that the petition to compel arbitration was based

We need not resolve this question because it is clear that even without reliance upon the rule stated in *Nghiem* and *Gerard*, respondent's demands for arbitration, along with her acceptance of a defense funded by NORCAL in the malpractice case and agreement to the settlement resulting from that defense, constituted conduct seeking the benefit, and therefore requiring acceptance of the burden, of the insurance policy. Respondent's agreement to the settlement of the malpractice case was affirmatively demonstrated by her signature.[12] And, as stated above, Murphy's demands for settlement and for arbitration on behalf of respondent were ratified by her failure to disaffirm them. ■ "[A] principal is not allowed to ratify the unauthorized acts of an agent to the extent that they are beneficial, and disavow them to the extent that they are damaging. If a principal ratifies part of a transaction, he is deemed to ratify the whole of it." (*Navrides v. Zurich Ins. Co.* (1971) 5 Cal.3d 698, 704 [97 Cal.Rptr. 309, 488 P.2d 637, 49 A.L.R.3d 828].) ■ From the time the complaint against Dr. and Mrs. Newton was tendered to NORCAL, through the settlement which NORCAL funded (albeit under a reservation of rights) and respondent signed, and the institution of arbitration proceedings at the Newtons' behest, respondent asked

---

on the grounds that "a dispute exists arising out of a contract of insurance issued by NORCAL to Dr. Harvey Newton, that the insurance policy requires that such disputes be submitted to arbitration, and that Dr. Harvey Newton and Mrs. Nancy Newton, having previously agreed to arbitration and having already selected a party arbitrator now refuse to submit to arbitration and to participate in selection of a neutral arbitrator." At the hearing, respondent's attorney argued that the notice referred only to the issue of respondent's prior agreement to arbitrate, not to her receipt of benefits under the policy. NORCAL's counsel responded that it would not matter if respondent had not previously agreed to arbitration because that was not the only ground for the petition; according to NORCAL's counsel, the phrase "the insurance policy requires that such disputes be submitted to arbitration" gave notice of the "benefits" theory. The trial court viewed the notice as suffering from a grammatical problem because of its use of dependent clauses in the sentence quoted above. When NORCAL's attorney argued that respondent knew she received benefits under the policy and knew the grounds NORCAL was raising, the court stated that "the only thing that they oppose is on the grounds that she's not a party to the contract, and that she did not consent. NORCAL's counsel then stated: "And that's fine. She doesn't have to consent to it. We can agree to that right now; that she never asked for arbitration in the past. What we do is look at her conduct under the policy. It's analogous to a third-party beneficiary. She's availed herself to the benefits of the contract." The court indicated it understood the argument but the question was whether respondent had been given notice "that was the premise of your argument." The petition was denied without prejudice, with the expectation that NORCAL would re-notice it. Taken in the context, it is clear that NORCAL's counsel was not admitting that respondent had never asked for arbitration in the past but rather was attempting to emphasize the independence of the two grounds for the petition under discussion, respondent's agreement to arbitrate on the one hand and her receipt of benefits under the policy on the other. We read the statement that respondent suggests is a judicial admission as nothing more than a statement "for the sake of argument."

[12]While respondent makes much of the fact that NORCAL required only Dr. Newton's consent to settle the malpractice case, and not respondent's, only Dr. Newton was the named insured, whose written consent to settle was required by the policy.

NORCAL to treat her as an employee or health care extender covered under her husband's professional liability policy. Regardless of whether respondent was in fact entitled to such coverage, having sought and accepted the benefit of the insurance policy in handling the underlying malpractice suit, respondent was required to abide by the policy's requirement of arbitration of disputes.

This conclusion is not altered by the declaration of the Newtons' attorney, Murphy, that he provided no services to respondent separate from those performed on behalf of Harvey Newton and that respondent derived no benefit from NORCAL's agreement to provide her with a defense.[13] The fact that the case against the Newtons settled quickly and, in retrospect, proved to require little work specific to the representation of respondent is beside the point.[14] The benefit respondent obtained from the insurance policy was the provision of legal representation in defense of the malpractice claim. At the time she accepted this representation, the underlying claim had not been settled and it could not have been foreseen what services Murphy would be called upon to provide in the defending against it. By accepting NORCAL's defense, respondent avoided having to assume the cost of a defense to the malpractice action on her own. To allow respondent to rely upon the insurance policy to obtain representation but disavow the applicability of the arbitration provision to her would be to allow her to pick and choose the portions of the policy she wished to accept.

We are not persuaded by respondent's argument that she could not be bound by the arbitration provision because she did not receive *all* the benefits of the policy. Respondent relies on two cases in support of this proposition. In the first, *Fruitvale Canning Co. v. Cotton* (1953) 115 Cal.App.2d 622, 624 [252 P.2d 953], disapproved on other grounds in *Lucas v. Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685], the

---

[13]Murphy stated in his declaration in opposition to the motion to compel arbitration that between October 14, when NORCAL agreed to defend Nancy Newton, and November 20, when the malpractice case settled, he "did not perform any legal services that were directed to the defense of Nancy Newton. From the time I participated in the defense of this action through and including its completion, there were no legal services provided by this firm that were required to be done because Nancy Newton was named as a defendant. The legal services provided in this matter were done in connection with the defense of Dr. Newton. Nancy Newton was not the subject of any discovery." Murphy further declared that he was aware that NORCAL "apportioned the entire amount of the settlement, $1,000,000, to a payment on behalf of Harvey Newton" and that in his opinion "Nancy Newton did not derive any benefit by virtue of NorCal's agreement to provide her with a defense," which agreement occurred approximately 30 days before the case settled.

[14]That Murphy performed at least *some* legal services on behalf of respondent is demonstrated by the inclusion in the Newtons' mediation brief of a short section devoted to respondent's liability (or lack thereof).

owner of a box factory entered an agreement with Fruitvale Canning Company under which Fruitvale advanced $25,000 which the box factory owner was to repay at the rate of $5,000 a year, and the owner was to provide certain materials to Fruitvale with their price credited against his debt. Subsequently, the box factory was sold and Fruitvale sued the new and former owners for a balance due of $21,000. Fruitvale argued that the new owners had voluntarily accepted the benefit of the former owner's contract with Fruitvale and therefore were required to assume its obligations. *Fruitvale* held that the rule of Civil Code section 1589, requiring one who accepts the benefits of a transaction to assume its obligations, generally applies only to parties to the transaction and is applied to nonparties only when "all the benefits of a full performance have inured" to assignees. (*Fruitvale, supra,* 115 Cal.App.2d at p. 626.) Since the principal benefit to the original owner under the contract was the advance of $25,000 and this advance did not inure to the benefit of the new owners, the new owners could not be held liable under Civil Code section 1589.

In *Recorded Picture Co. v. Nelson Entertainment, Inc.* (1997) 53 Cal.App.4th 350 [61 Cal.Rptr.2d 742], the producers of a motion picture transferred to the distributor all domestic distribution rights in the movie in perpetuity, as well as the movie's copyright. The contract between the producers and the distributor contemplated that the latter would separately contract with a subdistributor for home video release and obligated the distributor to require such subdistributor to pay 70 percent of gross receipts directly to the producers. The distributor's contract with the subdistributor did not contain such a provision but rather called for a 50/50 split of net receipts between the subdistributor and distributor. *Recorded Picture Co.* held that the subdistributor did not receive the benefit of the producers' agreement with the distributor: While the distributor received all domestic distribution rights in perpetuity, the subdistributor only received the right to release the movie in the home video market for a period of seven years, with the right then reverting to the distributor. Since the subdistributor did not receive the benefit of the producers' agreement with the distributor, it was not bound by the obligations of that contract. (*Id.* at pp. 356, 362-365.)

The assignment of contracts at issue in *Fruitvale* and *Recorded Picture Co.* is not at issue in the present case and the rationale of holding assignees to the obligations of a contract only if they receive all the benefit of the contract does not directly translate to the matter before us. Here, respondent attempted to obtain benefits under the insurance policy as an insured. Despite NORCAL's rejection of her claim to be insured under the policy, it afforded her a defense that would not have been available to her but for the policy. While respondent was informed she would not receive indemnification from

NORCAL, even her husband, the policyholder, was not assured indemnification: NORCAL's ultimate responsibility for the claim will depend on the determination whether the settlement was in fact covered under the policy. The fundamental point is that respondent was not entitled to make use of the policy as long as it worked to her advantage, then attempt to avoid its application in defining the forum in which her dispute with NORCAL should be resolved. Another maxim of jurisprudence is relevant here: "He who takes the benefit must bear the burden." (Civ. Code, § 3521.) "No person can be permitted to adopt that part of an entire transaction which is beneficial to him/her, and then reject its burdens." (*Halperin v. Raville* (1986) 176 Cal.App.3d 765, 772 [222 Cal.Rptr. 350].)

The order denying the petition to compel arbitration is reversed.

Haerle, J., and Lambden, J., concurred.

A petition for a rehearing was denied October 30, 2000, and respondent's petition for review by the Supreme Court was denied January 10, 2001.