Filed 1/11/22  Borisoff v. The Pullman Group CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LEONARD W. BORISOFF, | B297162, B298972, B299796 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC454901) |
| v. | |
| THE PULLMAN GROUP, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge.  Affirmed.

AlvaradoSmith, W. Michael Hensley for Defendants and Appellants.

Krane & Smith, Jeremy D. Smith, Daniel L. Reback for Respondent Currency Corp., Successor in Interest to Plaintiff Leonard W. Borisoff.

_____

Leonard W. Borisoff a successful songwriter, assigned his royalty rights and his claims against a third party to The Pullman Group, LLC, Wertheim, LLC, Structured Asset Sales, LLC, and David Pullman (collectively Pullman) by way of an assignment agreement that contained an arbitration clause.

Borisoff later sued Pullman, which in turn filed a motion to compel arbitration. The trial court granted the motion without having determined a valid arbitration agreement existed, leaving that task to the arbitrators. The arbitrators returned an award for Pullman in the amount of $41,000 plus $67,866.13 in attorney fees. Pullman moved to confirm the award, which the trial court granted, again deferring to the arbitrators for the determination whether a valid arbitration agreement existed. Borisoff appealed from the resulting judgment.

In that prior appeal we held that before a matter may be sent to arbitration a trial court must in the first instance determine whether a valid arbitration agreement exists. (*Borisoff v. The Pullman Group, et al.* (Sept. 1, 2016, B259675) [nonpub. opn.] (*Borisoff I*).) We further held that the arbitration award could not be confirmed because portions of the assignment agreement were illegal, and the arbitrators made no distinction between void and non-void provisions in rendering their award. Accordingly, we reversed the judgment with no directions about what to do on remand.

In dicta we observed that the assignment agreement's consideration was "patently illusory," and that in another appeal involving a virtually identical assignment agreement between Pullman and a third party, the agreement "as a whole was unconscionable because it was written in visually dense, incomprehensible language, heavily favored its author, and was

2

obtained under conditions of undue influence." (*Borisoff I*, B259675, at p. *5.)

On remand, Pullman again moved to compel arbitration, but this time only as to those provisions of the assignment agreement that were not illegal. The trial court denied the motion on the grounds that the agreement lacked consideration and was procedurally and substantively unconscionable. The court awarded attorney fees to Borisoff and denied in part Pullman's motion to tax costs.

In three appeals, Pullman appeals the rulings (1) denying arbitration (appeal No. B298972); (2) granting Borisoff attorney fees (appeal No. B297162); and (3) denying Pullman's motion to tax costs (appeal No. B299796). We consolidated the appeals, and Borisoff moved to dismiss the first appeal as frivolous.

We deny the motion to dismiss but affirm the court's orders.

## BACKGROUND

We set forth the facts in *Borisoff I* as follows (headings omitted):

"Borisoff was a successful vocalist, songwriter and producer in the 1960's who as a result of his work owned rights to royalty income of up to $30,000 per year, payable by such companies as Broadcast Music, Inc., Universal Music Publishing, Minder Music, and SoundExchange (collectively BMI). Borisoff used this royalty stream to obtain loans from Currency Corp., a finance lender. When a conflict arose between Borisoff and Currency over Currency's interest rates and accounting practices, Borisoff assigned both his assignable and nonassignable claims against Currency, as well as his music library, to Pullman.

3

"The assignment agreement, which Pullman drafted, is set forth in 13 visually and verbally dense single-spaced pages with small typeface and relatively few paragraph breaks.  It provided that Pullman would pay Borisoff $100,000 (later amended to $50,000) for his music library and all related claims and 'rights,' less 'costs.'

"The agreement defined 'costs' as 'including, but not limited to, the cost [of setting up an LLC (which Pullman would own) to acquire Borisoff's royalty rights], the costs to secure recognition of the transfer of the Rights to Pullman by Broadcast Music, Inc. ("BMI"), Universal Music Publishing, Sounds of Universal, Inc., and any Universal related entity, ("Universal"), Minder Music Publishing and any related entity ("Minder"), MCA, and any MCA related entity, Universal Records and any Universal related entity ("Universal Records") and SoundExchange, Inc. and any related entity ("SoundExchange"), EMI UNART Catalogue, Inc., EMI Group, EMI Music Publishing and any EMI related [*sic*] and any and all record labels, record companies, music companies, worldwide distributors ("Record Companies"), and all Administrators, Societies, and Publishers worldwide, and the costs of any necessary lien searches.'  Also to be deducted was the cost of 'any liens, claims, encumbrances, judgments or advances . . . [and] any amounts withheld by Pullman to pay and discharge any or all of the liens.'

"The assignment agreement provided that Pullman would also effectively subtract from the purchase price any funds that 'Pullman at its sole discretion, shall designate [as] consulting fees paid to Owner pursuant to a separate Consulting Fee Agreement.'  Under this provision, if Pullman felt 'at its sole discretion' that it owed Borisoff $10,000 in consulting fees under

4

a separate consulting agreement, for example, it could dedicate $10,000 of the purchase price as payment of those fees, effectively subtracting that amount from whatever might be due under assignment agreement.

"In addition to $100,000 (later $50,000), Pullman would pay Borisoff any royalties earned over $50,000 in 2008, $55,000 in 2009, $60,000 in 2010, et cetera, but if the amount earned equaled less than these amounts, any deficit would carry over to the next and all following years. For example, if only $30,000 were earned in 2008, Borisoff would receive in 2009 only those royalties earned in excess of $75,000.

"Borisoff would be paid when he 'met all conditions and requirements' stated in the agreement, which effectively meant after 'Pullman has received a . . . written acknowledgement from [each of the entities listed above] of their acceptance of the transfer of the Rights to Pullman,' although Pullman reserved the right 'at its solo option' to 'withhold sufficient funds deducted from the Purchase Price to discharge the claims of any lien claimant.'

"In addition to a monetary payment based on royalties, Pullman offered to pay Borisoff 50 percent of any proceeds from litigation of Borisoff's non-assignable claims against Currency.

"The financial aspect of the assignment's consideration was patently illusory, because in the unlikely event that some portion of the purchase price remained after payment of global 'costs,' Pullman could at its discretion designate that portion as satisfaction of a separate consulting agreement. And because it is undisputed Borisoff's royalty stream does not exceed $50,000 per year, he would be entitled to no residual payments in 2008 and following.

5

"The 'rights' Borisoff ceded to Pullman included any claims against Currency, including 'assignable claims and non-assignable claims . . . without limitation, including the right of filing litigation of the assignable and non-assignable claims, the right to settle, the right to control and receive the proceeds of any and all awards and or settlement or compromise from any and all claims whether assignable or non-assignable.' The agreement provided that '[a]ll proceeds from any non-assignable claims are directed to be paid to Pullman and to be under control of Pullman as well as first right of refusal and matching right in and to [Borisoff's] economic interest in the proceeds of any assignable and nonassignable claims. Pullman shall have sole control and authority to settle or compromise or litigate any of the assignable and non-assignable claims and [Borisoff] grants David Pullman an irrevocable power of attorney with regard to the assignable and non-assignable claims.' Borisoff had no 'right or authority to settle or in any way compromise the non-assignable claims (including the assigned proceeds relating thereto) without the prior written consent of Pullman. Any such action by [Borisoff] to compromise the non-assignable claims in any way shall be deemed null and void. Pullman and [Borisoff] shall share all proceeds of the Currency Corp. Parties non-assignable claims proceeds equally on a 50/50 basis . . . .'

"We examined these identical provisions in two appeals in other cases, where we concluded they were void because they purported to authorize Pullman to practice law without a license, commercialized the practice of law, and violated public policy by granting David Pullman power to veto settlement in any litigation against Currency. However, we deemed the provisions to be severable from the remainder of the contract because they

6

were collateral to the contract's central purpose. (*Wertheim v. Currency Corp.* (May 22, 2012, B218547 [nonpub. opn.]); *Wertheim v. Omidvar* (Oct. 5, 2011, B218021 [nonpub. opn.]).) We observed in dicta in a third appeal that the assignment agreement as a whole was unconscionable because it was written in visually dense, incomprehensible language, heavily favored its author, and was obtained under conditions of undue influence. (*Currency Corp. v. Wertheim* (Sept. 30, 2013, B240444 [nonpub. opn.]).)

"The assignment agreement provided that any dispute arising from it would be settled by arbitration before a panel of three non-attorney arbitrators in accordance with the rules of the American Arbitration Association, the arbitration to occur within 60 days of the filing of the demand for arbitration and be completed in one day." (*Borisoff I*, B259675, pp. 2-5.)

By 2011, Pullman had paid Borisoff only an advance of $4,000.

Borisoff filed this lawsuit, seeking declaratory relief and rescission on the grounds of fraud and failure of consideration.

Pullman moved to compel arbitration, which the trial court granted. The arbitration panel entered an award in favor of Pullman, which the trial court confirmed and we reversed in *Borisoff I*.

On remand, Pullman again moved to compel arbitration.

The trial court found that as *Borisoff I* had already observed, the "financial aspect of the assignment's consideration was patently illusory" because "in the unlikely event that some portion of the purchase price remained after payment of global 'costs,' Pullman could at its discretion designate that portion as satisfaction of a separate consulting agreement." The court found

7

that "[w]here, as here, Defendants can claim various expenses as 'costs' and avoid paying Plaintiff altogether, the 'financial aspect' of this agreement must be deemed patently illusory."

The trial court found that the assignment agreement was procedurally unconscionable because, "[t]o reiterate the appellate court's observation, the . . . agreement consist[ed] of '13 visually and verbally dense single-spaced pages with small typeface and relatively few paragraph breaks,'" and "[o]n top of this, Pullman was the purchase agreement's sole drafter, and Plaintiff signed the purchase agreement while in financial straits."

The court found that the agreement's substantive unconscionability was "clear from the Court's foregoing findings" because the agreement "lack[ed] mutuality" and "heavily favor[ed] its author, Pullman," in that it "allow[ed] Pullman to reap a windfall through collection of Plaintiff's royalties and discretionary payments to Plaintiff."

Concluding that the assignment agreement lacked consideration and was unconscionable, the trial court denied Pullman's motion to compel arbitration.

Borisoff moved for an award of $306,426.48 in attorney fees under Civil Code section 1717, and sought $46,828.88 in arbitration and court costs. Pullman opposed the fees motion and moved to tax Borisoff's costs. The trial court awarded Borisoff $181,375 in attorney fees and $42,828.88 in costs.

## DISCUSSION

We review a trial court's legal conclusions de novo. (*Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1435.) To the extent the trial court's decision is based upon resolution of disputed facts, we review the decision for substantial evidence.

8

(*NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 71.)

## A. Appeal No. B298972

### 1. Motion to Dismiss

Borisoff contends that Pullman's appeal of the trial court's order denying arbitration is frivolous because, he argues, we held in *Borisoff I* that the assignment agreement was entirely illegal. The contention rests on a faulty premise, as we held in *Borisoff I* only that portions of the assignment agreement were illegal, not the entire agreement. Therefore, Borisoff's motion to dismiss is denied.

### 2. Merits on the Motion to Compel Arbitration

Pullman contends the trial court erred in denying Pullman's motion to compel arbitration on the ground that the arbitration agreement lacked consideration and was procedurally and substantively unconscionable. For reasons stated in *Borisoff I*, however, these findings were within the trial court's discretion. The court therefore properly denied Pullman's motion. (See (*Armendariz v. Foundation Health Psychcare Services, Inc*. (2000) 24 Cal.4th 83, 99 [pursuant to "general contract law principles," California courts may invalidate arbitration agreements when they contain provisions that are "unconscionable or contrary to public policy"].)

## B. Appeals B298972 and B299796

### 1. Attorney Fees and Costs are Awardable

Pullman contends no attorney fees or costs may yet be awarded because there is no final judgment or prevailing party. We disagree.

"In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to

9

enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).)

Here, the assignment agreement provides that in any arbitration proceeding arising from the agreement, "[t]he losing party shall reimburse the prevailing party for its reasonable outside attorneys' fees and costs incurred with respect to such arbitration proceeding."

Because Borisoff successfully forestalled arbitration, he is the prevailing party, and is entitled to attorney fees and costs.

Pullman argues no fees or costs may be awarded because the litigation, which Borisoff filed, did not terminate with the order denying arbitration. We disagree.

An order denying a motion to compel arbitration is final for purposes of that arbitration. (See *Marcus & Millichap Real Estate Inv. Brokerage Co. v. Woodman Inv. Grp*. (2005) 129 Cal.App.4th 508, 514-515.) In *Marcus*, the trial court granted fees to a party that successfully sought to vacate an arbitration award, even though the litigation was ongoing. Marcus held that where no rehearing is ordered, an order vacating an arbitration award is of necessity final, even if further litigation is possible. (*Id*. at p. 515.)

Here, Borisoff filed this litigation in part to forestall arbitration. Therefore, the trial court's order denying arbitration is final with respect to arbitration proceedings, even if it is not final for all purposes. The court was therefore entitled to award attorney fees and costs.

10

## 2. Fees Incurred With Respect to Arbitration Proceedings are Recoverable

Pullman argues that only attorney fees incurred "in" arbitration itself are recoverable. We disagree. The arbitration agreement provided that "[t]he losing party shall reimburse the prevailing party for its reasonable outside attorneys' fees and costs incurred *with respect to* such arbitration proceeding." (Italics added.) Fees incurred in litigation concerning an arbitration award are incurred "with respect to" the arbitration proceeding.

## 3. Costs Incurred During Arbitration are Recoverable

Pullman argues that only costs incurred outside the arbitration itself are recoverable, as any other costs would be the exclusive province of the arbitrator, which awarded costs to Pullman, not Borisoff. We disagree that costs incurred in arbitration may be awarded only by the arbitrator. A prevailing party "is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) Each party to an arbitration will pay a pro rata share of the arbitration costs "[u]nless the arbitration agreement otherwise provides." (Code Civ. Proc., § 1284.2.) In other words, parties to an arbitration are entitled to "reach their own agreement as to how the costs of arbitration should be awarded," and to move the trial court for an award of those costs. (*Dickinson v. Kaiser Foundation Hospitals* (1980) 112 Cal.App.3d 952, 955.) Here, the arbitration agreement "otherwise" provided that the prevailing party was to recover "attorneys' fees and costs incurred *with respect to* [the] arbitration proceeding" (italics added). We read this provision as enabling a party to seek costs incurred both in effectuating and prosecuting

an arbitration. That being the case, the court was entitled to award Borisoff costs pursuant to the parties' arbitration agreement.

## DISPOSITION

Borisoff's motion to dismiss appeal No. B298972 is denied. The trial court's orders are affirmed. Each side is to bear its own costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

CRANDALL, J.[*]

---

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.