[No. A092880. First Dist., Div. Five. July 10, 2002.]

DADRA MITCHELL et al., Plaintiffs and Respondents, v.
AMERICAN FAIR CREDIT ASSOCIATION, INC., et al., Defendants and
Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, parts I and II.B of this
opinion are not certified for publication.

## COUNSEL

Mayer, Brown & Platt, Fredrick S. Levin, Ronald D. Kurtz, Nicole Manna; Morrison & Foerster, Douglas L. Hendricks and Philip T. Besirof for Defendants and Appellants.

Girard & Green, Daniel C. Girard, Eric H. Gibbs and Martin S. Putnam for Plaintiffs and Respondents.

## OPINION

**SIMONS, J.**—The Legislature enacted the Credit Services Act of 1984 (CSA) (Civ. Code, § 1789.10 et seq.) in response to certain business practices of credit services organizations. These organizations offer to obtain credit or improve the credit standing of consumers who have experienced credit problems. The CSA sought to provide consumers with information necessary to decide whether or not to purchase such services, by requiring certain disclosures and by mandating that every credit services contract be in

writing and signed by the buyer. In this case, as a matter of first impression, we address a common question arising in a novel context. Consistent with the CSA, may a credit services organization modify its membership contract to require arbitration and preclude class relief by the simple expedient of notifying its members by mail that continued membership constitutes acceptance of the modification? We conclude it may not, because the CSA requires that contract modifications be signed. We further conclude that this requirement is not preempted by the Federal Arbitration Act and affirm the trial court's order denying in part the motion of defendants[1] to compel arbitration.

In addition, defendants attempt to appeal from a separate order of the trial court granting class action certification and from a third order denying in part their motion to define the scope of the class. Because defendants have no right of appeal from the orders granting class certification and defining the scope of the class, we dismiss the appeals from those orders for lack of jurisdiction.

## BACKGROUND

In July 1997, plaintiff Dadra Mitchell filed this class action suit against defendants, alleging plaintiff and the members of the class were solicited by defendants to participate in a credit repair scheme in which participants pay in excess of $500 to join a membership club that provides credit education materials and an unsecured VISA credit card with a $300 credit limit. The operative complaint alleges defendants misrepresent that members of AFCA will rebuild their damaged credit ratings through use of the education materials and the unsecured VISA card. The complaint asserts causes of action for violation of the CSA, violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.), unlawful/unfair business practices (Bus. & Prof. Code, § 17200 et seq.), and false and misleading advertising (Bus. & Prof. Code, § 17500 et seq.). The complaint seeks injunctive relief, in addition to compensatory damages, restitution and attorney fees.

In January 1998, six months *after* Mitchell filed the present lawsuit, AFCA changed its membership rules, obligating all new members to sign a separate agreement to arbitrate as part of the membership application process. AFCA also attempted to modify the terms of its membership agreement with existing AFCA members to require the arbitration of all disputes with AFCA as a condition of continued membership in AFCA.

On April 12, 1999, the trial court granted plaintiff's motion for class certification, certifying a class consisting of "all California residents who

---

[1]Defendants appealing are American Fair Credit Association, Inc. (AFCA), United Membership Marketing Group, Ltd. (UMMG), and United Insurance Companies, Inc. (UICI).

have entered into a membership contract with AFCA up to the present date, without prejudice to defendant seeking to narrow class membership during the course of this litigation." On May 5, 2000, AFCA petitioned this court for a writ of mandate seeking to direct the trial court to vacate its order of class certification. This court denied AFCA's writ petition on the ground that it failed to establish the propriety of writ review.[2]

On June 30, 2000, defendants filed a motion in the trial court to compel arbitration by all persons who joined AFCA beginning in January 1998, along with all existing members who impliedly agreed to the change in their membership agreement requiring arbitration by failing to cancel their memberships. The motion excluded plaintiff Mitchell, who defendants acknowledge had ceased her membership with AFCA before AFCA implemented its arbitration provision in January 1998.

Concurrently, defendants filed a motion for an order defining the scope of the class, arguing, among other things, that the trial court should narrow the scope of the certified class to exclude all those AFCA members subject to the arbitration provision. Defendants also sought an order narrowing the class definition to exclude persons whose claims were barred under the applicable statutes of limitation, and to exclude from the class persons who did not receive the same representations about AFCA that plaintiff purportedly received.

By separate orders entered October 3, 2000, the trial court granted in part and denied in part both motions. With respect to those class members who joined AFCA after January 1, 1998, and executed signed arbitration agreements, the court severed the claims for injunctive relief from the claims for damages or restitution and granted defendants' motion to compel arbitration of the monetary claims only. However, the trial court denied defendants' motion to compel arbitration for class members who received mailed notices of modification of their AFCA membership agreement "unless signed arbitration agreements were executed by such class members." Furthermore, citing *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066 [90 Cal.Rptr.2d 334, 988 P.2d 67], the trial court denied in its entirety defendants' motion to compel arbitration for the claims for injunctive relief.

The trial court's order regarding defendants' motion to define the scope of the class was consistent with its order regarding the motion to compel arbitration. The trial court severed from the class action the monetary claims for damages and restitution of members who joined AFCA after January 1, 1998, and had executed signed arbitration agreements. Further, the court

---

[2]*American Fair Credit Assn. v. Superior Court* (May 11, 2002, A090987) (nonpub. order).

excluded from the class those persons whose claims the trial court found were barred by the applicable statutes of limitations. In all other respects, the trial court denied the motion. This appeal followed.

## DISCUSSION

I. *Appealability of Orders re Class Certification and Scope of Class**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *The Order Partially Denying the Motion to Compel Arbitration*

A. *AFCA Members Who Never Signed the January 1998 Modification*

■ We consider whether the trial court correctly refused to compel arbitration for AFCA members who joined the organization before arbitration was mandatory and never signed the modification proposed by AFCA before January 25, 1998. ■ We review the trial court's partial denial of the motion to compel arbitration de novo, since the trial court resolved no factual disputes in ruling on the motion. (*NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 71 [100 Cal.Rptr.2d 683].)

■ In January 1998, AFCA sent its existing members a letter informing them that AFCA has "amended your Membership Agreement to provide for dispute resolution through arbitration." The letter stated that it enclosed a copy of the "ARBITRATION OF DISPUTES provision" and said it would become effective on January 25, 1998. The letter encouraged the members to "read this document [the 'Arbitration of Disputes Agreement'] very carefully as it does affect your rights to go to court, to have a jury trial, to engage in discovery or to be included as a member of any class of claimants with respect to any dispute."

The final paragraph of the letter informed the members they had the right to reject this change in their agreement and then stated the affirmative steps that each was obliged to take in order to opt out. Members would have to write AFCA before January 25, 1998, and state that they rejected the arbitration provision. "You must give this notice in writing: it is not sufficient to telephone us." The final sentence of the AFCA letter notified the members that, by continuing their membership beyond January 25, 1998, they would be agreeing to abide by the arbitration provision.

*See footnote, *ante*, page 1345.

### 1. *Modifications of Credit Services Agreements Must Be Signed*

Defendants contend that the opt-out procedure they employed created a valid modification of the membership agreement. The membership agreement provided that "[t]his contract may be amended or modified only by an instrument in writing." ■ Defendants argue, and we agree, that a written agreement or instrument in writing results when there is a writing containing all terms and acceptance by the party to be charged. (*E.O.C. Ord, Inc. v. Kovakovich* (1988) 200 Cal.App.3d 1194, 1201 [246 Cal.Rptr. 456].) In *E.O.C. Ord, Inc.*, the appellate court determined that a letter setting forth the terms of an attorney fee agreement sent to a client constituted an instrument in writing, for purposes of determining the length of the statute of limitations, even though the letter was never signed by the client. (*Id.* at p. 1202.) Further, we agree with defendants that a consumer may be held to have accepted a written modification when the consumer receives notification of it, is provided an opportunity to accept or reject it, and accepts the modification according to the instructions provided. Numerous federal cases have found an acceptance of a written modification when, as here, the consumer fails to opt out. (See, e.g., *Bank One, N.A. v. Coates* (S.D.Miss. 2001) 125 F.Supp.2d 819, 830-834; *Marsh v. First USA Bank, N.A.* (N.D.Tex. 2000) 103 F.Supp.2d. 909, 919.)

The contract formation requirements of the CSA, however, are deter-■ ■ Plaintiff persuaded the trial court that *E.O.C. Ord, Inc. v. Kovakovich, supra*, 200 Cal.App.3d 1194, was inapposite because the CSA requires that the contract, as modified, must not only be written, but signed. We agree.

The CSA was enacted by the Legislature, in part, to protect the public from unfair or deceptive advertising and business practices employed by some credit services organizations. (Civ. Code, § 1789.11, subd. (b).) Included in section 1789.11 is an express statement of legislative intent describing why it was enacted and how it should be interpreted: "(a) The ability to obtain and use credit has become of great importance to consumers, who have a vital interest in establishing and maintaining their credit worthiness and credit standing. As a result, consumers who have experienced credit problems may seek assistance from credit services organizations

---

[3]We reject defendants' argument that the requirements of the CSA do not impact codefendants UICI and UMMG because these defendants "do not meet the definition of 'credit services organization' set forth in Civil Code section 1789.12." AFCA's modification of the membership agreements for this group of members is the only basis asserted by defendants to compel these plaintiffs into arbitration. To the extent AFCA's failure to comply with the CSA renders its modification of the membership agreements for this group of members unenforceable, no legal basis remains for any entity to compel plaintiffs into arbitration.

which offer to obtain credit or improve the credit standing of such consumers. [¶] Certain advertising and business practices of some credit services organizations have worked a financial hardship upon the people of this state, often those who are of limited economic means and inexperienced in credit matters. Credit services organizations have significant impact upon the economy and well-being of this state and its people. [¶] (b) The purposes of this title are to provide prospective buyers of services of credit services organizations with the information necessary to make an intelligent decision regarding the purchase of those services and to protect the public from unfair or deceptive advertising and business practices. [¶] (c) This title shall be construed liberally to achieve these purposes."

Civil Code section 1789.13 lists more than a dozen activities in which credit services organizations may not engage. The list reflects abuses enumerated in the legislative history, which motivated adoption of the CSA. (State and Consumer Services Agency, Enrolled Bill Rep. on Assem. Bill No. 3654 (1983-1984 Reg. Sess.) Sept. 5, 1984, pp. 1-2 [Background].)

In Civil Code section 1789.16,[4] the Legislature provided a multilayered set of protections to consumers. Credit services contracts were required to be

---

[4]Civil Code section 1789.16 provides, in pertinent part:

"(a) A credit services organization shall not provide any service to a buyer except pursuant to a written contract that complies with this section. Every contract between the buyer and a credit services organization for the purchase of the services of the credit services organization shall be in writing, shall be dated, signed by the buyer, and include all of the following:

"(1) A conspicuous statement in size equal to at least 10-point boldface type, in immediate proximity to the space reserved for the signature of the buyer, as follows: 'You, the buyer, may cancel this contract at any time prior to midnight of the fifth day after the date of the transaction. See the attached notice of cancellation form for an explanation of this right.'

"(2) The terms and conditions of payment, including the total of all payments to be made by the buyer, whether to the credit services organization or to some other person.

"(3) A full and detailed description of the services to be performed by the credit services organization for the buyer, including all guarantees and all promises of full or partial refunds, and the estimated date by which the services are to be performed, or the estimated length of time for performing the services not to exceed six months or a shorter period consistent with the purposes of this title as may be prescribed by the Department of Justice.

"(4) The credit services organization's principal business address and the name and address of its agent, other than the Secretary of State, in the State of California, authorized to receive service of process.

"(b) The contract shall be accompanied by a completed form in duplicate, captioned 'Notice of Cancellation,' which shall be attached to the contract and easily detachable, and which shall contain in type of at least 10-point the following statement written in the same language as used in the contract:
" 'Notice of Cancellation'
" 'You may cancel this contract, without any penalty or obligation, within five days from the date the contract is signed.

" 'If you cancel, any payment made by you under this contract must be returned within 15 days following receipt by the seller of your cancellation notice.

in writing and "signed by the buyer." (§ 1789.16, subd. (a).) Each contract must include a series of specific advisements to the buyer, along with a full and detailed description of the services to be performed for the buyer and the charges for such services. (§ 1789.16, subd. (a)(1)-(4).) Further, the credit services organization is required to attach to the contract a specifically worded notice of cancellation indicating there is a five-day grace period following the date of signature during which the consumer may reconsider and cancel the contract. Finally, a copy of the fully completed contract and all other documents that the credit services organization requires the buyer to sign are to be given to the buyer at the time they are signed, to assist in that reconsideration. (§ 1789.16, subd. (b).)

 Our interpretation of the CSA is guided by familiar principles. Our primary duty is to give effect to the Legislature's intent, in a manner that advances the statute's purpose. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) Here, the Legislature has expressly set out its intent: to provide consumers with the information necessary to make intelligent purchasing decisions and to protect consumers from unfair and deceptive business practices. (Civ. Code, § 1789.11, subd. (b).) To that end, it mandated that *every* contract between a consumer and a credit services organization be signed and contain certain disclosures. Defendants argue that we should interpret the phrase "every contract" to mean only the initial contract; they urge us to refuse to apply the CSA's contract formation requirements to modifications of credit services agreements. As an alternative, they propose that if the formation requirements do apply to contracts as modified, we should limit this application to modifications of the provisions that must be disclosed pursuant to Civil Code section 1789.16, subdivision (a)(1) through (4).

We are unwilling to accept either proposed interpretation. First, when a material term in a contract is altered or added, a new agreement between the

---

" 'To cancel this contract, mail or deliver a signed and dated copy of this cancellation notice, or any other written notice, to

_____ at

(name of seller)

_____ _____
(address of seller) (place of business)

not later than midnight _____.
(date)

" 'I hereby cancel this transaction.'

_____ _____
(date) (purchaser's signature)

"A copy of the fully completed contract and all other documents the credit services organization requires the buyer to sign shall be given to the buyer at the time they are signed."

parties has been reached.[5] It certainly would not be unreasonable for the Legislature to intend to extend the protections of the CSA to credit services agreements as modified or to utilize the phrase "every contract" to manifest that intent.

Moreover, if we were to choose the more restrictive interpretation put forward by defendants and exclude contracts as modified from the reach of the CSA, we would seriously undermine the Legislature's purpose: an unscrupulous provider of credit services could overcome the protections of this act simply by obtaining a buyer's signed assent to one set of terms for the initial purchase of credit services and later modifying any of those terms by employing an opt-out procedure similar to the one used here. (See Civ. Code, §§ 1789.11, 1789.16.) In view of the Legislature's directive that the CSA be construed liberally to achieve its purposes, we conclude that the requirements of Civil Code section 1789.16 apply to credit services agreements as modified.

At oral argument, defendants contended that this interpretation would require that the disclosures mandated by the CSA be repeated in every subsequent modification. We disagree. The statutory requirements are applied to the *contract as modified*, not to each modification. If the contract as modified contains the appropriate disclosures, they need not be repeated. A new signature is required, however, to encompass the additional or altered terms.

Defendants' alternative argument, that a new signature is required only if the modification affects any of the contract terms for which disclosure is required, is more congruent with the statutory goal, but is incompatible with the language of Civil Code section 1789.16, subdivision (a). The phrase "Every contract . . . shall be in writing . . . and include . . . the following [disclosures]" can fairly be interpreted to include all contracts as modified or none of them. The middle ground proposed by defendants could not be adopted without effectively rewriting the statute. This is a task we leave to

---

[5]Appellants have never challenged the trial court's implicit conclusion that the modification was material. We agree with the trial court, but we need not determine that every modification of a credit services agreement adding an arbitration clause is material per se. Such a determination might be viewed as singling out arbitration for special, less favorable treatment, in violation of the Federal Arbitration Act. (Cf. *J.J.'s Mae, Inc. v. H. Warshow & Sons, Inc.* (2000) 277 A.D.2d 128 [717 N.Y.S.2d 37].) Instead, we note that, in addition to mandating arbitration, the challenged modification precludes class relief. In the context of this case, where claims for the return of fees paid will be relatively small and the financial resources of potential plaintiffs are apt to be limited, the denial of class relief may significantly hinder a plaintiff's ability to obtain legal assistance. Modifying the agreement to preclude class relief in the specific context of this contract is a material change, independent of the arbitration requirement.

the Legislature in the event it chooses to reconsider the wording of its enactment.

### 2. *The Federal Arbitration Act Does Not Preempt the CSA*

Should this court interpret the CSA to require signed assent to the challenged modification, defendants contend it would be preempted by the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.). Again, we disagree.

The FAA was enacted to overcome the unwillingness of the courts to enforce agreements to arbitrate. As Justice Breyer has noted, this unwillingness could be traced to "ancient times" and the fight by British courts to extend their jurisdiction. When Congress passed "the Arbitration Act in 1925, it was 'motivated, first and foremost, by a . . . desire' to change this antiarbitration rule. [Citation.] It intended courts to 'enforce [arbitration] agreements into which parties had entered,' [citation], and to 'place such agreements "upon the same footing as other contracts," ' [citations]." (*Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 270-271 [115 S.Ct. 834, 838, 130 L.Ed.2d 753] (*Allied*); see *Dean Witter Reynolds Inc. v. Byrd* (1985) 470 U.S. 213, 219-220 [105 S.Ct. 1238, 1241-1242, 84 L.Ed.2d 158].) To effectuate that goal, the FAA provides, in pertinent part, "an agreement in writing to submit to arbitration an existing controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2 (hereafter section 2).)

 Though the FAA incorporates a strong federal policy of enforcing arbitration agreements (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 96 [99 Cal.Rptr.2d 745, 6 P.3d 669]), the policy does not arise until an enforceable agreement is established. "Whether there is an agreement to submit disputes to arbitration or reference does not turn on the existence of a public policy favoring [alternative dispute resolution] . . . . That policy, whose existence we readily acknowledge, does not even come into play unless it is first determined that the Bank's customers *agreed* to use some form of [alternative dispute resolution] to resolve disputes . . . . [Citations.]" (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 790 [79 Cal.Rptr.2d 273]; see *Victoria v. Superior Court* (1985) 40 Cal.3d 734, 739 [222 Cal.Rptr. 1, 710 P.2d 833] [" '[T]he policy favoring arbitration cannot displace the necessity for a voluntary *agreement* to arbitrate.' [Citations.]"].) In applying the FAA, the United States Supreme Court has made clear that "When deciding whether the parties agreed to arbitrate . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts. [Citations.]" (*First Options of Chicago,*

*Inc. v. Kaplan* (1995) 514 U.S. 938, 944 [115 S.Ct. 1920, 1924, 131 L.Ed.2d 985]; see also *Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co.* (1998) 68 Cal.App.4th 83, 92-93 [80 Cal.Rptr.2d 147].)

In applying state law rules to determine if an agreement to arbitrate exists, we are mindful that, to the extent these rules single out arbitration agreements and impose special burdens on them, they interfere with the statutory goal of placing such agreements on an equal footing and are preempted. A review of FAA preemption decisions does not suggest that they require preemption of the CSA contract formation requirements as we have interpreted them here.

Under the FAA, courts have stricken state laws which invalidate arbitration agreements per se. For example, in *Southland Corp. v. Keating* (1984) 465 U.S. 1, 5 [104 S.Ct. 852, 855-856, 79 L.Ed.2d 1], the high court considered the California Franchise Investment Law, which had been interpreted by the California Supreme Court to require the judicial consideration of claims arising under the statute, barring arbitration agreements reached by the parties. The high court held that, so interpreted, the California statute directly conflicted with section 2 of the FAA, violating the supremacy clause. (*Southland Corp.*, at p. 10 [104 S.Ct. at p. 858].) In *Allied*, the high court invalidated an Alabama statute "making written, predispute arbitration agreements invalid and 'unenforceable.' [Citation.]" (*Allied, supra,* 513 U.S. at p. 269 [115 S.Ct. at p. 837].) In *Perry v. Thomas* (1987) 482 U.S. 483, 490 [107 S.Ct. 2520, 2525-2526, 96 L.Ed.2d 426], the high court held preempted a state statute that invalidated agreements to arbitrate certain wage collection claims. (See also *Basura v. U.S. Home Corp.* (2002) 98 Cal.App.4th 1205, 1212-1214 [120 Cal.Rptr.2d 328] [Code Civ. Proc., § 1298.7, which invalidates arbitration clauses contained in agreements to convey real property, is preempted by the FAA]; *Saturn Distribution Corp. v. Williams* (4th Cir. 1990) 905 F.2d 719 [Virginia statute prohibiting automobile manufacturers and dealers from entering into mandatory alternative dispute resolution agreements is preempted].)

Courts have also held state statutes preempted that impose exceptional burdens to entering into arbitration agreements or to proving the existence of such agreements. In *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687 [116 S.Ct. 1652, 1656, 134 L.Ed.2d 902] (*Casarotto*), the high court held that the FAA preempted a Montana statute that prescribed a heightened notice requirement for arbitration provisions in a contract: "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [section] 2. [Citations.] [¶] Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration

provisions. [Citations.]" (See *Armendariz v. Foundation Health Psychcare Services, Inc., supra,* 24 Cal.4th at p. 98 ["[U]nder California law, as under federal law, an arbitration agreement may only be invalidated for the same reasons as other contracts."]; see also *Chase v. Blue Cross of California* (1996) 42 Cal.App.4th 1142, 1161 [50 Cal.Rptr.2d 178] and cases discussed therein.) In *Progressive Cas. v. C.A. Reaseguradora Nacional* (2d Cir. 1993) 991 F.2d 42, 46, the circuit court invalidated a New York law that imposed a higher burden of proof to establish agreements to arbitrate than to establish other agreements.

The common chord in these decisions is that state laws[6] treating arbitration as a disfavored method of resolving disputes are preempted to fulfill the FAA's goal of putting arbitration clauses on an equal footing with other contracts. However, the FAA does not preempt a neutral state law contract formation requirement simply because it can be applied to invalidate an arbitration agreement. (*Chase v. Blue Cross of California, supra,* 42 Cal.App.4th at p. 1160.) We believe the CSA signature requirement is such a law.

██ Nothing in our interpretation of the CSA suggests that arbitration clauses are invalidated per se. Neither the language of the CSA nor its legislative history even hints that the signature requirement was imposed to affect arbitration. In fact, the trial court enforced the arbitration provision for any class member who signed an agreement containing one. Further, our interpretation does not subject arbitration clauses to disparate treatment. To the contrary, from two distinct perspectives it is clear that the signature requirement is a neutral contract principle. First, all contract provisions covered by the CSA are subject to this formality. No special barrier to an agreement by the parties to arbitrate is imposed. Second, conditioning the enforcement of a contract on a party's signature, while not universal, is certainly widespread in this state. It is imposed in a broad array of commercial and noncommercial settings. Commercial Code sections 2201 and 10201 preclude enforcement of a contract for the sale of goods for $500 or more or for a lease of goods (except nonconsumer leases of under $1,000) unless it is signed by the party against whom enforcement is sought. The general statute of frauds requires a signature from the party to be charged in a variety of different contexts including any agreement that by its terms is not to be performed within a year from its making, and any agreement for the sale of real property or for the lease of real property for longer than one year. (Civ. Code, § 1624, subd. (a)(1) & (3); see 1 Witkin, Summary Cal. Law (9th ed.

---

[6]Court decisions on preemption do not distinguish between a state statute, administrative regulation or judicial decision. (*Securities Industry Ass'n v. Connolly* (1st Cir. 1989) 883 F.2d 1114, 1120, fn. 4.)

1987) Contracts, §§ 261-262, pp. 258-259 [exhaustive list of California agreements subject to a signature requirement].)

Defendants argue for a more stringent preemption standard. They contend that a state law that does not single out arbitration agreements for less favorable treatment may still be preempted. Defendants maintain that the only state law contract principles that can invalidate an arbitration clause, without being preempted by the FAA, are those which apply to every provision in every contract in the state. They point to the final clause of section 2 of the FAA and ask us to interpret it *as if it read*, "an agreement in writing to submit to arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of [*every*] contract." Defendants' contentions find some support in the case law. In its decisions preempting specific state laws under the FAA, the high court has consistently described those that would survive FAA preemption as "generally applicable contract defenses." (See *Casarotto, supra,* 517 U.S. at p. 687 [116 S.Ct. at p. 1656]; see *Allied, supra,* 513 U.S. at p. 281 [115 S.Ct. at p. 843]; *Perry v. Thomas, supra,* 482 U.S. at pp. 492-493, fn. 9 [107 S.Ct. at p. 2527].) In listing examples of such defenses, the court has cited fraud, duress, and unconscionability, each one of which applies to every contract. (*Casarotto,* at p. 687 [116 S.Ct. at p. 1656]; *Allied,* at p. 281 [115 S.Ct. at p. 843]; *Shearson/American Express, Inc. v. McMahon* (1987) 482 U.S. 220, 226 [107 S.Ct. 2332, 2337, 96 L.Ed.2d 185].)

In addition, following the close of briefing, defendants referred us to *Bradley v. Harris Research, Inc.* (9th Cir. 2001) 275 F.3d 884. In *Bradley,* the Ninth Circuit Court of Appeals considered Business and Professions Code section 20040.5, a part of the California Franchise Relations Act that voids clauses restricting venue to a forum outside this state for claims relating to a franchise agreement involving a franchise business operating within this state. The federal district court had held that Business and Professions Code section 20040.5 invalidated a term in the subject franchise agreement requiring that disputes be arbitrated in Utah. The Ninth Circuit reversed, finding that this state statute was preempted by section 2 of the FAA, even though it does not single out arbitration or treat it as a disfavored dispute resolution technique. The Ninth Circuit itself recognized that the holding in *Casarotto* could be limited to "state statutes that 'single out' arbitration provisions, as opposed to statutes that affect both arbitration and litigation," but held that the California law should be preempted because it was not generally applicable. (*Bradley,* at p. 889) "[Business and Professions Code section] 20040.5 applies only to forum selection clauses and only to franchise agreements; it does not apply 'to any contract.' " (*Bradley,* at p. 890; see *KKW Enterprises v. Gloria Jean's Gourmet Coffees* (1st Cir. 1999) 184 F.3d 42, 50-52, and

*OPE Intern. LP v. Chet Morrison Contractors, Inc.* (5th Cir. 2001) 258 F.3d 443, 447 [both of which reached the same result with similar state franchise statutes from Rhode Island and Louisiana, respectively].)[7] However, neither *Bradley* nor any of the United States Supreme Court decisions relied on by defendants involved a contract formation requirement like the one here, which is doubly neutral; the signature requirement applies to all provisions in credit services agreements and, through the operation of other California statutes, is imposed on a wide range of contracts not covered by the CSA.

■ The touchstone for interpreting the FAA should be its purpose. The FAA preempts state law "to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citation.]" (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 477 [109 S.Ct. 1248, 1265, 103 L.Ed.2d 488].) In *Perry v. Thomas, supra,* 482 U.S. at pages 492-493, footnote 9 [107 S.Ct. at page 2527], the high court sketched the permissible ambit of state regulation: "[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of [section] 2." In *Allied,* the high court reiterated that theme: "States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of *any* contract.' [Citation.] What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The [FAA] makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the [FAA's] language and Congress' intent." (*Allied, supra,* 513 U.S. at p. 281 [115 S.Ct. at p. 843].) Further, it may be useful to recall the high court's formulation of the FAA's purpose: "to make arbitration agreements as enforceable as other contracts, but not more so." (*Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395, 404, fn. 12 [87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270].)

■ Applying the CSA signature requirement to arbitration clauses does not reflect hostility to such provisions or interfere with any purpose of the FAA. Manifestly, we have not established a different set of requirements for enforcing a contract's "basic terms (price, service, credit) . . . [and] its

---

[7]See also *Doctor's Associates v. Hamilton* (2d Cir. 1998) 150 F.3d 157, 163 (New Jersey case law invalidating a franchise agreement's forum selection clause preempted by the FAA); *Alphagraphics Franchising v. Whaler Graphics* (D.Ariz. 1993) 840 F.Supp. 708, 710 (same, except as applied to Michigan forum selection statute regarding franchise agreements).

arbitration clause." (*Allied, supra,* 513 U.S. at p. 281 [115 S.Ct. at p. 843].) Our interpretation of the CSA accords arbitration clauses an identical status with other clauses in original credit services agreements or agreements as modified and so is not preempted by the FAA.[8]

B. *Claims for Injunctive Relief**

. . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The trial court's order regarding defendants' motion to compel arbitration entered on October 3, 2000, is hereby affirmed. The appeal from the order certifying the class entered on April 12, 1999, and the appeal from the order defining the scope of the class entered on October 3, 2000, are hereby dismissed. Costs on appeal shall be awarded to respondents.

Jones, P. J., and Stevens, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 23, 2002. Brown, J., was of the opinion that the petition should be granted.

---

[8]In light of the conclusion we reach on this issue, we need not address any of plaintiff's remaining contentions that the modification attempted by AFCA is unenforceable.
*See footnote, *ante*, page 1345.