Filed 9/30/13  Currency Corp. v. Wertheim CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CURRENCY CORPORATION, | B240444 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC417798) |
| v. | |
| WERTHEIM, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Michael P. Linfield, Judge.  Reversed and remanded.

Ecoff Blut, Lawrence C. Ecoff and Philip H. R. Nevinny; Benedon & Serlin, Douglas G. Benedon and Gerald M. Serlin for Plaintiff and Appellant.

Law Offices of Robert S. Besser, Robert S. Besser; Lauren M. Greene for Defendants and Respondents.

_____

Appellant lender made scores of small loans to a borrower over the course of a dozen years, each memorialized by a note and secured by the borrower's income. One note, in the amount of $6,500 and dated June 2, 2006 (the June 2006 note), contained an arbitration provision and a broad release of all claims the borrower might have against the lender on any other note. The borrower and her assignee, respondents here, instituted arbitration proceedings against the lender pursuant to the terms of the June 2006 note. After determining that the arbitration provision in the June 2006 note constituted an agreement to arbitrate any dispute relating to any of the notes, the arbitrators awarded respondents $672,122. The superior court confirmed the award.

We reverse. The arbitration provision in the June 2006 note pertained only to that note. The trial court therefore erred in confirming an award encompassing all the notes.

## BACKGROUND

This is the second appeal in this matter, and the facts have not changed since our last ruling. As before, we take them from a voluminous record containing several pleadings, the declarations of various interested persons, and the record of a three-day arbitration hearing.

Parviz Omidvar is the founder, owner and CEO of Currency Corporation (Currency), a lender, and Tiffany Ventures, LLC (Tiffany), which engages in real estate transactions. Currency loans money to persons who own rights to royalty income payable by such entities as the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music Inc. (BMI). The loans are typically secured by the borrower's royalty income. Omidvar's two adult sons, Oliver and O'Neil Omidvar, participate extensively in this business. (Omidvar, Currency, Tiffany, Oliver and O'Neil are collectively the Omidvar parties.)

David Pullman is the owner of Wertheim, LLC and the founder and CEO of Structured Asset Sales, LLC (collectively the Pullman parties). Pullman has negotiated with several of Currency's borrowers for assignment of their claims against the Omidvar parties.

2

Maibell Page, born in 1941, is the widow of Eugene Page, a highly successful songwriter, arranger and producer who died in 1998. Eugene received periodic royalty payments from ASCAP and BMI, two music rights management companies. ASCAP, for example, generally made payments 30 times per year. Maibell's two adult children, Jennifer and Christopher Page, sometimes helped with her financial matters.[1] Maibell was a preschool teacher until 2005, when she suffered a debilitating stroke. After her stroke Maibell was severely debilitated, stopped working, and was incapable of managing her financial affairs. She resided in some sort of assisted living community, shopped at thrift stores, and received Social Security as her primary source of income.

**The First Series of Loans: 1997 to 2006**

From 1997 to 1998, Currency entered into a financial arrangement with Eugene pursuant to which he directed ASCAP to remit his royalty payments to Currency in return for Currency providing him with a line of credit. The agreement obligated Currency to make loans to Eugene on demand, collect royalty payments from ASCAP to pay off the loans, and remit any overage to Eugene.[2] The agreement also obligated Currency to maintain and provide an ongoing accounting. To provide this royalty-advance service Currency charged a fee, typically comprising "interest" on each loan in the amount of 2 percent every 10 days, compounded daily, plus a 20 percent administrative fee.[3] The loans were typically for less than $5,000, had maturity periods of 5 to 17 months, and were memorialized by promissory notes. The promissory notes were typically two or three single-spaced pages long and had several boxes for the borrower's initials and a signature line at the end.

---

[1] We sometimes use the parties' first names for the sake of clarity.

[2] Pursuant to royalty assignment agreements, Eugene and later Maibell directed ASCAP to make royalty payments directly to Currency.

[3] This works out to an annual loan cost of approximately 107 percent.

Eugene passed away in 1998, owing Currency approximately $50,000. When he died, his royalty rights transferred to Maibell, who also received a $623,000 death benefit from the American Federation of Musicians.

Parviz Omidvar appeared at Eugene's funeral and persuaded Maibell to continue Eugene's financial relationship with Currency. At some point, Omidvar persuaded Maibell to loan the $623,000 death benefit to Tiffany at an interest rate of 5 percent, which was reduced to 2 percent from 2003 to 2005 and thereafter returned to 5 percent.

In the ensuing years Currency made scores of loans to Maibell, ranging from $46.06 to $44,326.09, on terms similar to those that had been extended to Eugene.

Omidvar had similar arrangements with several other entertainers and their family members.

**Pullman's Intervention: May to October 2006**

In early 2006, Pullman telephoned Maibell and asked if he could meet with her regarding her financial relationship with Currency. When she refused, he appeared at her door and advised her that the terms of the Currency loans were unfair and that Omidvar had misappropriated her ASCAP royalty stream. He offered to investigate the financial relationship between Maibell and Omidvar in exchange for 50 percent of whatever he could recoup for her and an assignment of all of her rights to Eugene's music catalog. Maibell requested that her children be present at the meeting but Pullman persuaded her to exclude them because they might become too emotional.

In two agreements drafted by Pullman, Maibell assigned to Pullman her claims against the Omidvar parties and all her royalty rights to the Eugene Page music catalog, and all income derived from it. (The second agreement, dated May 20, 2006, contained an arbitration provision that will be discussed below.) The purchase price for the Page music catalog was $100,000 less the costs of securing the income," with $1,000 being paid up front.

The assignment agreement provided that Maibell would not be paid for the Page catalog until she had "met all conditions and requirements as stated in" the agreement. Maibell was "responsible for all costs directly related to the Closing, including, but not

4

limited to, the cost to form [a corporation or vehicle to receive royalties], if necessary, the costs to secure recognition of the transfer of the Rights to Pullman by Arista, BMG, Sony, RCA, J Records, EMI, EMI Capitol and any EMI related company, Broadcast Music Inc. (BMI), Warner Chappell Music Publishing and any Warner related entity, Unichappell Music, Inc.[,] American Society of Composers, Authors and Publishers (ASCAP), American Federation of Musicians (AFM)[,] any rights societies throughout the world, any and all record companies throughout the world and any and all publishers and the costs of any necessary lien searches. Such costs shall be deducted from payment of the Purchase Price at Closing. Prior to the Closing, Pullman, at its sole discretion, shall designate the portions, if any, of the Purchase Price that shall be consulting fees paid to Owner pursuant to a separate Consulting Fee Agreement."

Thus Maibell, who Wertheim admits was "an unsuspecting elderly widow with short term memory loss, who had been institutionalized for mental illness," assigned her rights to Eugene's music catalog, along with royalty income of approximately $50,000 per month, to Pullman for essentially $1,000.

**The June 2006 Note**

On June 2, 2006, Currency made the loan that is the subject of this action. As evidenced by the June 2006 note, Currency loaned Maibell $6,500 for six months at an interest rate of 2 percent compounded every 10 days, with an administrative fee of 10 percent.

The June 2006 note contained an arbitration provision as follows: "[A]ny claim or dispute pertaining to this Note" "shall be settled by arbitration before a panel of three non-attorney arbitrators in accordance with the rules of the American Arbitration Association. The arbitration hearing is to occur within 60 (sixty) days of the filing of the demand for arbitration. The arbitrators shall decide any issue as to whether a particular claim is subject to arbitration hereunder. Judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction. The losing party shall reimburse the prevailing party for its reasonable outside attorneys' fees and costs incurred with respect to such arbitration proceeding. The Parties hereby waive any and all rights

to the award of punitive damages in any claim submitted to arbitration. Any arbitration proceedings or other disputes hereunder shall be kept confidential by the Parties and not publicized in any manner whatsoever."

The June 2006 note also contained a global release of any claims or defenses arising from the June 2006 note and all "prior notes."[4]

Although all notes produced in the years-long proceedings below were signed or at least initialed by Maibell or Eugene, no signed copy of the June 2006 note has ever been produced. Currency has always contended the note was forged by Pullman, as evidenced by the fact that the unusual arbitration provision in the June 2006 note is an almost

---

[4] The text of the release was as follows: "As additional consideration for this Loan, Borrower acknowledges and agrees that: (a) such Borrower has no claim or cause of action against [Lender] and all of its past, present and future sister companies, related companies, and affiliated companies; and all of their past, present, and future (i) directors, officers, employees, shareholders, capital sources, consultants, advisors, and agents; and (ii) heirs, executors, administrators, successors and assigns ("Dischargees"); (b) such Borrower has no offset right, counterclaim, or defense of any kind against any of the Obligations [defined previously, albeit in the singular, **as any obligation evidenced by a note VERIFY**], whether arising from this Note or prior notes; and (c) [Lender] has heretofore properly performed and satisfied in a timely manner all of [its] obligations to each Borrower. [Lender] wishes, and Borrower agrees, to eliminate any possibility that any past conditions, acts, omissions, events, circumstances, or matters would impair or otherwise adversely affect any of Lender's rights, interests, collateral security, or remedies. Therefore, Borrower, on behalf of itself and all of its heirs, executors, administrators, successors, assigns, and any and all other entities and persons claiming rights through such Borrower, unconditionally releases, acquits, and forever discharges the Dischargees from (i) any and all liabilities, obligations, duties, or indebtedness of any of the Dischargees to said Borrower, whether known or unknown, arising prior to the date hereof, and (ii) any and all claims, offsets, causes of action, suits, or defenses, whether known or unknown, which said Borrower might otherwise have against any of the Dischargees on account of any condition, act, omission, event, contract, liability, obligation, indebtedness, claim, cause of action, defense, circumstance, or matter of any kind which existed, arose or occurred at any time prior to the date hereof. As further consideration for the above release, Borrower hereby agrees, represents, and warrants that the matters released herein are not limited to matters which are known or disclosed, and Borrower hereby waives any and all rights and benefits which it now has or in the future may have, conferred upon it by virtue of the provisions of Section 1542 of the Civil Code of the State of California, which provides . . . [etc.]."

verbatim copy of the arbitration provision in the May 20, 2006 assignment drafted two weeks earlier by Pullman.[5]  However, respondents presented testimonial and circumstantial evidence that Maibell did in fact enter into the agreement memorialized by the June 2006 note, and various trial judges and the arbitration panel have found it to be valid.  The validity of the June 2006 note is thus not before us.

The relationship between Maibell and Pullman soured in September 2006, when Omidvar informed Jennifer and Chris that Maibell had given Eugene's music catalog to Pullman.  Maibell then sued Pullman for fraud and elder abuse and sought rescission of the assignment, alleging Pullman had isolated her from her family and induced her to transfer Eugene's entire music library to him for essentially $1,000.

---

[5] The May 20, 2006 assignment agreement contained an arbitration provision that tracked almost verbatim the arbitration provision in the June 2006 note:  "The parties agree that any controversy or claim whatsoever arising out of or relating in anyway to this agreement and or transaction(s) by, or against Pullman, its affiliates, nominees, assignees, principals, officers or employees and any related entities including, but not limited to, Structured Asset Sales, LLC, Structured Asset Sales Group, LLC, Wertheim, LLC, David Pullman or by Owner against Pullman and any related entities and individuals including but not limited to those listed above in this paragraph, for its breach or any of the transactions or services contemplated herein *shall be settled by arbitration before a panel of three non-attorney arbitrators* in Los Angeles County, California, *in accordance with the rules of the American Arbitration Association.  The arbitration hearing is to occur within 60 (sixty) days of the filing of the demand for arbitration.  The arbitrators shall decide any issue as to whether a particular claim is subject to arbitration hereunder.  Judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction.  The losing party shall reimburse the prevailing party for its reasonable outside attorneys' fees and costs incurred with respect to such arbitration proceeding.  The Parties hereby waive any and all rights to the award of punitive damages in any claim submitted to arbitration.  Any arbitration proceedings or other disputes hereunder shall be kept confidential by the Parties and not publicized in any manner whatsoever.*"  Pullman and Maibell signed the assignment agreement on June 2, 2006, the same date Currency loaned Maibell $6,500 pursuant to the June 2006 note.  Currency argued at every stage below that the concurrence between Pullman's May 20, 2006 assignment agreement and the June 2006 note was evidence that Pullman forged the June 2006 note.

Jennifer Page was deposed during the pendency of this litigation. She testified Maibell had suffered a stroke in 2005 that caused her to experience severe anxiety and problems with writing and speaking. By May of 2006 she was disoriented, had debilitating panic attacks, and suffered from depression. Several times when Pullman met with Maibell in 2006 he brought a notary along and asked Maibell not to permit Jennifer or Christopher to attend the meetings. When Jennifer came to one of the meetings anyway, an assignment had been signed and the notary had left. Pullman told Jennifer the document Maibell had signed "wasn't a big deal." It was just "a paper giving Pullman permission to investigate" Omidvar. Pullman did not tell Jennifer he had negotiated with Maibell to receive: (1) Assignment of all of her claims against Currency; (2) 50 percent of the proceeds of any unassignable claims; (3) Eugene Page's music catalog (for $1,000); (4) Maibell's assistance in pursuing all claims and securing all rights; and (5) Maibell's funding of the pursuit of all claims and securement of all rights.

On January 27, 2009, the parties settled the litigation, with Pullman releasing all interest in the Page music catalog and Maibell assigning to him her claims against the Omidvar parties. Maibell also agreed to cooperate in any litigation Pullman brought against Omidvar and Currency.

**Resumption of the Currency Loans**

In the meantime, Currency resumed its financial relationship with Maibell and over the next two years made at least 14 loans to her ranging from $1,494.17 to $17,000. The loans bore compound interest at a rate of 2.25 percent per every 15 days, required payment of a 10 percent administrative fee, and were secured by the Eugene Page royalty stream. The promissory notes memorializing the loans typically comprised five single-spaced pages, with lines designated for the borrower's initials and signature lines for the borrower and Currency. None contained an arbitration provision.

In the first note, dated October 16, 2006 (the October 2006 note), Currency attempted to retrofit its promissory notes to comply with California finance law. That and all following notes bore the following language: "**ALL PAST FINANCING LENDER PROVIDED BORROWER WAS PART OF A COMMERCIAL LINE**

**OF CREDITY; [SIC] AND BORROWER HAS USED ALL PAST AND WILL USE ALL PRESENT AND FUTURE FINANCING FROM LENDER FOR COMMERCIAL PURPOSES ONLY (THAT IS, BORROWER HAS NOT USED, IS NOT USING, AND WILL NOT USE ANY FINANCING FROM LENDER FOR CONSUMER USES INCLUDING WITHOUT LIMITATION PERSONAL, FAMILY OR HOUSEHOLD USES). BORROWER UNDERSTANDS THAT LENDER DOES NOT OFFER FINANCING FOR CONSUMER USES AND IS RELYING ON BORROWER'S REPRESENTATIONS AND WARRANTIES IN THIS SECTION IN DECIDING TO PROVIDE BORROWER WITH FINANCING**." This retrofit was apparently in response to several lawsuits filed against the Omidvar parties by Pullman in which it was alleged Currency's loans violated the Finance Code.

The October 2006 note also purported to resolve all past disputes between the parties and set forth a dispute resolution process. Paragraph 13 of the note provided as follows: "BORROWER WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS, THE RELATIONSHIP BETWEEN BORROWER AND LENDER, OR ANY PRIOR DEALINGS BETWEEN THE PARTIES. Upon a written request of any party to this Agreement, or upon an appropriate motion by any party, any cause of action, dispute or controversy between or among the parties ("Claim") shall be heard by a single referee ("Referee"), pursuant to the provisions of California Code of Civil Procedure §§ 638 et seq., as such statutes may be amended or modified from time to time, who shall then try all issues (including any and all questions of law and questions of fact relating thereto), and issue findings of fact and conclusions of law and report a statement of decision. The Referee's statement of decision will constitute the conclusive determination of the Claim. The parties agree that the Referee shall have the power to issue all legal and equitable relief appropriate under the circumstances before him/her." The note provided that its terms would be binding on any party's successors.

**Action by Wertheim against Omidvar and Currency**

On August 5, 2008, Wertheim filed a lawsuit against the Omidvar parties, Los Angeles Superior Court (LASC) case number BC395819, alleging they interfered with Maibell's assignment of claims against Currency to Wertheim.

**Arbitration Demand**

On June 8, 2009, citing the June 2006 note, Wertheim filed a form demand for arbitration with the American Arbitration Association (the AAA). Wertheim alleged the nature of the dispute was: "Fraud; Conversion; Breach of Contract; Violation of Finance Lenders Act; Violation of Business and Profession[s] Code Section 17200; Breach of Contract; Elder Abuse arising from a series of loan transactions; RICCO [sic]; Racketeering; Fraud in the inducement; Fraud in the Execution; Breach of Fiduciary Duties; Constructive Trust; Money Had and Received; Civil Conspiracy; Conversion; An Accounting." He demanded $5 million, later increasing the demand to approximately $41 million.[6] In violation of AAA rules Wertheim failed to attach a copy of the June 2006 note to the demand, providing only arbitration language that it represented was taken from the note.[7]

The AAA notified Currency of Wertheim's arbitration demand on June 15, 2009 and gave it three days—to June 18—to select three arbitrators from a panel of fifteen. Currency immediately objected that it had not received a copy of any agreement that would authorize the AAA to resolve any dispute between Currency and Wertheim. The AAA responded the next day by requesting that Wertheim submit a copy of any contract

---

[6] At the arbitration hearing the panel summarily rejected Wertheim's attempt to increase its demand.

[7] AAA Rule R-4, subdivision (a)(ii), directs the party demanding arbitration to file "two copies of the arbitration provisions *of the contract*." (Italics added.) Wertheim stated the parties were subject to "an arbitration agreement dated June 2, 2006," but filed only the purportedly excerpted arbitration provision, not the note itself. This filing did not comply with the AAA rule because it failed to show the provision was part of any contract.

containing an arbitration provision. It did not, however, change the deadline for selecting arbitrators or otherwise acknowledge Currency's objection to jurisdiction. On the contrary, the AAA stated any jurisdictional objections would be determined by the arbitrator panel.

Currency received a copy of the June 2006 note on June 19, 2009. It immediately objected that the note was unsigned and failed to reference most of the parties against whom Wertheim demanded arbitration. Currency also sent Maibell a written request to resolve any dispute before a single referee, as provided by the October 2006 note.

On June 22, 2009 the AAA informed the parties it had unilaterally appointed three arbitrators, gave them one week to file objections to AAA jurisdiction, billed them for $3,425 each, and gave them one week to pay that bill. On June 23, 2009, Currency responded with a one-sentence objection, in boldface type: "The AAA is aware that the arbitration clause that Mr. Pullman submitted is unsigned and has never been signed." Wertheim responded that Currency itself possessed the original, signed copy of the June 2006 note. Wertheim also produced a deposition transcript from the earlier litigation in which Jennifer Page had testified she once faxed to Pullman "the papers that [her] mom signs when she wants to get money." The AAA gave the parties four days to respond to each others' contentions. Currency complained the AAA was "rushing" it "to defend a $5,000,000.00 claim within 60 days although the AAA ha[d] no color of authority to hear th[e] case" based on a "fraudulent document" that "was never signed, performed, or otherwise entered into." The AAA calendared a conference call hearing to determine the jurisdiction dispute.

On July 7, 2009, Currency sent a letter brief to the AAA in which it argued arbitration is consensual in nature, and may be invoked only when the parties have chosen to arbitrate their disputes. It reiterated that no executed June 2006 note existed and neither Wertheim's allegations that such a note was in Currency's possession nor Jennifer's testimony that she faxed "the papers" to Pullman established the fact. Currency further argued that even pursuant to such a note, if one existed, the scope of

11

arbitration would be only the $6,500 at issue on that one note, not the $5 million claimed by Wertheim.

The arbitrators were unimpressed. After the telephonic hearing on July 9, 2009, they issued an order stating they "find and determine that there is sufficient basis to proceed to a hearing on the merits, and deny Respondents' objections regarding jurisdiction arbitrability, but without prejudice" to Currency revisiting the matter during arbitration. Further, the arbitrators stated they felt constrained to abide by the 60-day time limit set forth in the June 2006 note, and therefore gave Currency one week to produce "the full record of all commercial notes and/or promissory notes . . . which were signed by or otherwise related to Claimant Page," "all documents . . . pertaining to the relationship between Claimant Page and any named Respondent," "a full history and accounting of all loans and advances from any named party to Claimant Page . . . showing each loan or advance made, how much interest was charged, how much in processing fee was charged, when each loan or advance was funded, and when each loan or advance was repaid," and "a full accounting . . . of all royalty payments made to Claimant Page, either directly or through any named party."

The arbitrators set the hearing for July 21, twelve days after the telephonic hearing on jurisdiction.

On July 14, 2009, Wertheim filed a petition stating the relief sought in arbitration, detailing its claims for the first time, and elevating the amount sought from $5 million to $40 million. Wertheim asserted 10 causes of action against Currency, including fraud and elder abuse, and sought an accounting of all transactions between "approximately 1999 to 2009." Wertheim alleged all the transactions between Maibell and Currency were subject to the arbitration clause in the June 2006 note.

**Proceedings to Enjoin Arbitration**

The Omidvar parties filed the instant lawsuit against Wertheim to enjoin arbitration. (LASC No. BC417798.) The case was assigned to Judge Michael Stern in Department 62. On July 16, Currency moved ex parte in Department 86 before Judge David P. Yaffe for a temporary restraining order enjoining arbitration on the ground that

12

no arbitration agreement existed. In support of the motion, Parviz Omidvar declared Currency made no loan to Maibell in June 2006, none of the promissory notes from 1997 to 2002 contained an arbitration provision, and the June 2006 promissory note had been forged. Currency argued that even if the arbitration provision in the June 2006 note was valid, it was valid only as to the $6,500 at issue on that note, and only as to Currency, not Tiffany or the Omidvars. Finally, Currency argued the court, not the arbitrators, must in the first instance determine whether an arbitration agreement exists. In opposition to the application for a TRO, Pullman submitted the declaration of Jennifer Page, who stated she witnessed Maibell sign the June 2006 note.

Judge Yaffe denied Currency's motion for a TRO, stating "there is a factual dispute as to whether [the June 2, 2006] note is in existence . . . ."

**Arbitration Hearing**

Maibell testified at the arbitration hearing but was unable to remember even her own age and stated she did not understand the purpose of the proceedings. She testified she first met Omidvar at Eugene's funeral in 1998, where he told her Eugene had died owing "a lot of taxes" but he, Omidvar, "could take care of everything." Maibell testified she was "really really afraid of the taxes situation, and entrusted her finances to Omidvar. She stated she had no idea how much money was being paid to Currency by ASCAP every month, how much Currency was retaining, or what the terms of the Currency loans were. The money she received from Currency and her own pay as a preschool teacher were her only sources of income. When asked to explain two documents by which she released claims against Omidvar and one by which she loaned $623,000 to Tiffany, Maibell testified she thought the purpose of the documents was to "get some money." She testified, "I thought he was really a nice person who gave me money. I didn't know anything about financial."

Christopher testified Omidvar encountered him at Eugene's funeral, said Christopher "was like another son" to him, and said Eugene died owing him money and owing his entire retirement fund to taxes, but he, Omidvar, would take the retirement fund and shelter it and determine a course to help the Pages through their financial

13

difficulties.  Christopher admitted several of the loans Omidvar ostensibly made to Maibell were for his, Christopher's, and Jennifer's own use, as he would go to Omidvar, receive a promissory note memorializing a loan from Omidvar to Maibell, take the note to his mother for her signature, take the signed note back to Omidvar, receive a check made out to Maibell, deposit the check in Maibell's account, and have Maibell write a personal check to him.  He admitted Maibell did not understand the transactions, and he and Jennifer used the money to pay off his own credit cards, purchase cars and homes, and pay for Jennifer's college tuition.

Christopher testified that Currency refused to provide an accounting despite his repeated requests for one, and although Currency knew the loans it extended to Maibell were used to finance Christopher's and Jennifer's cars and houses, did not inform Christopher it was holding Maibell's $600,000 retirement account.

Christopher testified that when Pullman came on the scene he induced Maibell to sign a number of documents in the presence of a notary but specifically asked that her children not be present.  There ensued a lawsuit against Pullman to regain the Page music library, which settled with return of the library and assignment to Pullman of Maibell's claims against Currency.  Christopher also testified that Oliver Omidvar told him that if he participated in the arbitration or gave any documents to Pullman, Currency would "file a claim against" Maibell.

Christopher authenticated a scan of a check made out to Maibell by Chantal Music Publishing, another Omidvar entity, signed by Omidvar, for $6,500 on June 2, 2006, with a memo line reading "Re: Royalty Advancement."

Oliver Omidvar testified Pullman had filed nine lawsuits against Currency in recent years and did not deny having warned Christopher against participating with Pullman.  He testified no loans made to Maibell between February 22 and June 2, 2006 were memorialized by a promissory note.  Oliver admitted that when royalty payments from ASCAP exceeded Maibell's loan indebtedness the excess funds were not remitted to Maibell but were instead retained by Currency in a "residual account" for the purpose of indemnifying the Omidvar parties "for any liabilities that come out of the third-party

14

lawsuits, such as losses with Mr. Pullman. And this was held—not spent, but held to see what was going to happen with the litigation that Mr. Pullman had filed against Currency Corp." Oliver made no attempt to identify a contractual justification for the retention of Maibell's "residuals," and immediately after this testimony tendered a check to Maibell in the amount of $20,000 as purported payment of them.

Oliver also admitted no accounting existed for Maibell's account until he began generating one—for the period of 2002 to 2006 only—the night before the arbitration hearing began. He admitted Currency maintained no accounting of sums loaned to Eugene or Maibell from 1997 to 2002 and had no way of creating one. Oliver testified that although individual promissory notes entitled Currency to charge 2 percent interest every ten days, Currency sometimes in its discretion charged less. However, he admitted no records supported the imposition of such a lesser charge and he did not know and had no way to find out when the charge was imposed.

**Arbitration Award**

On August 27, 2009, the arbitration panel found the parties had "entered into a broad arbitration agreement dated June 2, 2006 granting authority to the Arbitrators to hear and decide those claims submitted in the Demand for Arbitration dated June 8, 2009." The panel did not explain this finding. It rendered an award against Currency only, granting Maibell and Wertheim $503,086 in damages, $110,000 in attorney fees and costs, $11,850 in administrative fees and expenses, and $47,186.10 in arbitrators' fees, for a total of $672,122.10.

**Petitions to Confirm and Vacate the Award**

Wertheim petitioned to confirm the award and Currency to vacate it, again arguing the June 2006 promissory note was forged. Judge Stern declined to engage the issue because he felt it had already been adequately litigated in arbitration, stating "The opposition to the award is nothing more than an attempt to re-litigate what has been presented to the arbitration . . . ." The court dismissed Currency's petition, confirmed the award and entered judgment.

Currency appealed from the judgment and we reversed the trial court's orders, holding that an arbitration award cannot be confirmed absent a judicial determination at some stage in the proceedings that an agreement to arbitrate existed. (*Currency Corp. v. Wertheim*, May 20, 2011, B222851 [nonpub. opn.].)

**Proceedings on Remand**

On remand, Wertheim moved for a determination that the June 2006 note contained a valid arbitration agreement. Currency opposed the motion, arguing again that the June 2006 note was forged by Pullman. The superior court concluded the June 2006 note was "genuine" and contained "an agreement that required the parties to arbitrate the dispute."

Currency moved for reconsideration, arguing the June 2006 note had been superseded by the October 2006 agreement. The trial court granted the motion but upon reconsideration affirmed its prior ruling that an arbitration agreement existed. Wertheim then moved to confirm the arbitration award. Currency opposed the motion and moved to vacate the award. The trial court granted Wertheim's motion, denied Currency's, and entered judgment for Wertheim in the amount of the award plus interest, costs and attorney fees.

Currency timely appealed.[8]

## DISCUSSION

We review the trial court's decision on arbitrability for substantial evidence insofar as it is based upon resolution of disputed facts. (*NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 71.) We review de novo a trial court's legal conclusions. (*Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1435.)

Currency contends the arbitration award should be vacated because (1) the October 2006 release superseded the June 2006 arbitration agreement, assignment, (2) the scope of arbitration should have been restricted to the $6,500 allegedly put in issue by the

---

[8] We grant respondents' request for judicial notice and deny their motion to strike appellant's reply brief or alternatively to permit further briefing.

16

June 2, 2006 promissory note, the only agreement with an arbitration clause, and (3) the arbitrators violated AAA rules.  We agree with Currency's second contention, and do not reach the others.

## A.  The Scope of the Arbitration Agreement

"Private arbitration (also called contractual or nonjudicial arbitration) 'is a procedure for resolving disputes which arises from contract; it only comes into play when the parties to the dispute have agreed to submit to it.'  [Citation.]" (*Toal v. Tardif* (2009) 178 Cal.App.4th 1208, 1218.)  "By agreeing to arbitration, parties anticipate a relatively speedy, inexpensive and final resolution, one that may be based on '"broad principles of justice,"' rather than strictly the rule of law.  [Citation.]  Consequently, 'as a general rule courts will indulge every reasonable intendment to give effect to arbitration proceedings.' [Citation.]" (*Ibid*.)  But the powers of an arbitrator are limited by the agreement. (*Advanced Micro Devices, Inc. v. Intel Corp*. (1994) 9 Cal.4th 362, 375.)  "'[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" (*Atkinson v. Sinclair Refining Co*. (1962) 370 U.S. 238, 241.)  "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." (*AT&T Technologies, Inc. v. Communications Workers of America* (1986) 475 U.S. 643, 649.)

An arbitration award "has the same force and effect as a contract in writing between the parties to the arbitration." (Code Civ. Proc., § 1287.6.)  A party may seek judicial enforcement of the award by petitioning the court to confirm it.  (Code Civ. Proc., § 1285.)  A petition to confirm an award is akin to a suit in equity seeking specific performance of the arbitration contract.  (See *Engineers & Architects Assn. v. Community Development Dept*. (1994) 30 Cal.App.4th 644, 653 [a petition to compel arbitration is a suit in equity seeking specific performance of an arbitration agreement].)

A petition to confirm an arbitration award must "[s]et forth the substance of or have attached a copy of the agreement to arbitrate . . . ."  (Code Civ. Proc., § 1285.4, subd. (a).)  "[T]he existence of the agreement is a statutory prerequisite to granting the petition . . . ."  (*Rosenthal v. Great Western Fin. Securities Corp*. (1996) 14 Cal.4th 394,

17

413.) Before a court may confirm an arbitration award it must find, or there must have been a prior judicial finding, that a valid arbitration agreement exists. (*Toal v. Tardif*, *supra*, 178 Cal.App.4th at p. 1221.) "[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable. . . . If the party opposing the petition raises a defense to enforcement—either fraud in the execution voiding the agreement, or a statutory defense of waiver or revocation [citation]—that party bears the burden of producing evidence of, and proving by a preponderance of the evidence, any fact necessary to the defense." (*Rosenthal*, *supra*, 14 Cal.4th at p. 413.)

Here, the June 2006 note set forth an agreement to arbitrate "Any claim or dispute pertaining to" the note. The note itself "pertained" to a $6,500 loan made by Currency to Maibell on June 2, 2006 and a global release of any claim against Currency arising on or before June 2, 2006. At most, therefore, Currency agreed to arbitrate Maibell's dispute over the June 2, 2006 loan and the scope of the release. It never agreed to arbitrate the merits of any other disputes. Yet Wertheim's arbitration demand referenced transactions from 1999 to 2009, alleging they were all subject to the arbitration clause in the June 2006 note, and the arbitrators apparently agreed, as they awarded Wertheim more than 100 times the value of the June 2, 2006 loan. This agreement, and thus the award, was "wholly groundless." (*Greenspan v. LADT*, *supra*, 185 Cal.App.4th at p. 1443.)

Neither the arbitrators nor the trial court explained why an arbitration provision applicable to (1) a loan and (2) a retrospective release should apply to scores of loans made over the course of more than a decade, both before and after the effective date of the provision. Wertheim offers no explanation now.

Wertheim first argues this court has no jurisdiction to determine the scope of the arbitration agreement, an argument we have repeatedly rejected in prior disputes between these parties and reject again now for reasons stated above. Wertheim then states without explanation that the June 2006 note provides it "fully supercedes any and all prior or contemporaneous understandings." The point is irrelevant. Even if the note

18

"superceded" all prior agreements, whatever that means, the arbitration provision itself provided that it applies only to the note itself. Nothing indicates the parties intended that it also apply to disputes arising from the superseded agreements. Finally, Wertheim states—again with no reasoning connecting the statement to its contention that the arbitration clause encompassed all of its claims—that the June 2006 note contained a release of all claims arising from earlier loans. This point too is irrelevant, as it means only that the parties agreed to arbitrate, at most, the validity of the release itself, not the underlying merits of released claims. (We note the arbitrators impliedly resolved the merits of the release by refusing to honor it.) In sum, Wertheim fails to explain how an agreement can both release claims and require that they arbitrated.

The only permissible scope of arbitration was the dispute over one loan made on June 2, 2006 loan for $6,500. In awarding more than 100 times this amount with no explanation, the arbitrators apparently accepted Wertheim's argument that all transactions between Currency and Maibell were before them. In doing so, they exceeded the scope of their mandate. Because they made no effort to particularize the award, it cannot be determined what amount they would have awarded on the June 2006 note alone. The entire award must therefore be vacated.

## B. The Enforceability of Agreements

Although we need not and do not reach the parties' other contentions, we feel constrained to make an observation about this litigation that may save time for all parties and the court below. Both sides urge us to accept and enforce provisions from various agreements between them and Maibell. Currency argues an October 2006 release superseded all prior promissory notes and should be enforced to preclude arbitration in the instant matter. Wertheim argues a June 2006 assignment transferred Maibell's rights to Wertheim, which renders the October 2006 release ineffective. Yet both sides have

19

admitted to conduct that amounts to breach of fiduciary duty and financial elder abuse.[9] Indeed, this entire litigation surrounds a three-sided effort to separate Maibell Page, an ill, incompetent senior, from her main source of income. Currency admitted during the arbitration hearing that it extended loans to Maibell after she suffered a stroke and became unable to understand the loan terms, failed and was unable to account for the money it took from her, and retained her money without just cause. (It offered to return the money at the hearing.) Christopher Page admitted he took Maibell's money for his own and his sister's uses, knowing Maibell was unable to understand the transactions. And Wertheim admitted it extracted financial agreements from "an unsuspecting elderly widow with short term memory loss, who had been institutionalized for mental illness." And all of the agreements were unconscionable. All were written in visually dense, incomprehensible language, heavily favored their authors, and were obtained under conditions of undue influence. Currency made purportedly commercial "loans" to Maibell—some for under $100—at 107 percent annual interest—charged at its own undisclosed discretion—while keeping no records. Wertheim bought a royalty stream from her, worth approximately $50,000 per year, for $1,000.

Courts may refuse to enforce a contract or clause on the ground that it was unconscionable when formed. (Civ. Code, § 1670.5, subd. (a); see *Armendariz v.*

---

[9] Welfare and Institutions Code section 15610.30 provides in part: "(a) 'Financial abuse' of an elder or dependent adult occurs when a person or entity does any of the following: [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 1575 of the Civil Code. [¶] (b) A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult."

*Foundation Health Psychcare Services, Inc*. (2000) 24 Cal.4th 83 [describing unconscionability].)  However, nothing before us now requires that we enforce any unconscionable agreement.  For example, the arbitration provision at issue is not itself unconscionable in this context because any party here who might complain of unconscionability, Wertheim or Maibell, is seeking instead to invoke the provision.  And the release contained in the October 2006 agreement is moot in light of our conclusion that the arbitration award must be vacated on other grounds.

## DISPOSITION

The trial court order granting Wertheim's petition to confirm the arbitration award is reversed.  The case is remanded to the superior court with directions to vacate the arbitration award.  Each side is to bear its own costs.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

MALLANO, P. J.

JOHNSON, J.